ANTHONY SUTTON, *d. b. a.* GRAND RAPIDS EGG EX-
CHANGE, v. MINNEAPOLIS & ST. LOUIS
RAILWAY COMPANY.[1]

June 28, 1946.

No. 34,203.

*Perry S. Johnson* and *Arthur LeSueur,* for appellant.

*C. W. Wright, John C. DeMar,* and *Richard Musenbrock,* for re-
spondent.

[1]Reported in 23 N. W. (2d) 561.

LORING, CHIEF JUSTICE.

This case comes here on appeal from an order granting judgment notwithstanding a verdict of $4,950 for plaintiff in a suit to recover damages for loss of a carload of eggs shipped from Pittsburgh to Minneapolis over defendant's railroad, as terminal carrier. The order was made in response to an alternative motion for judgment or a new trial.

In 1943, plaintiff was engaged at Grand Rapids, Michigan, in the business of buying, processing, and freezing eggs which were gathered by truck from producers over a radius of about 100 miles around Grand Rapids. The eggs involved in this suit were in part, at least, brought to plaintiff's establishment in May 1943. They were broken by his crew of about 75 girls and then canned in 30-pound containers which were subjected to a 72-hour freezing process. In December of that year, he shipped 1,200 such cans to Pittsburgh for cold storage. In June 1944, plaintiff had a carload of 870 cans of frozen eggs made up in Pittsburgh from two cold-storage warehouses. June 13 they were shipped to the Fairfax-Parsons Company in Minneapolis in care of the Booth Cold Storage Company. They arrived on the 19th of that month. The superintendent of the Booth company promptly opened the car, found a temperature of 40 degrees Fahrenheit in the middle of it, with some cans open and liquefied, and so reported to the consignee. On the 20th, the consignee refused to accept the eggs because of their condition. They were subsequently examined by officials and experts of the United States pure food and drug administration and of the state of Minnesota, whose determination was that a large percentage of the eggs were unfit for human consumption.

■ The liability of a common carrier to the shipper of perishable products is based upon failure to exercise ordinary care in the preservation of such products while in course of transportation. George B. Higgins & Co. v. C. B. & Q. R. Co. 135 Minn. 402, 161 N. W. 145, L. R. A. 1917C, 507; McNeill & Scott Co. v. G. N. Ry. Co. 156 Minn. 120, 194 N. W. 614; Howe v. G. N. Ry. Co. 176 Minn. 46, 222 N. W. 290. This rule is elaborated by the one that if the

shipper gives instructions as to the protective measures that shall be taken to preserve such products compliance with such instructions is complete protection to the carrier against liability for loss. Southern Pacific Co. v. Itule, 51 Ariz. 25, 74 P. (2d) 38, 115 A. L. R. 1268. No case to the contrary has been called to our attention. The rule is fundamentally just. Rule No. 135 of Perishable Protective Tariff No. 12, on file with and approved by the interstate commerce commission, is to the same effect. To make out a case against defendant, it must appear that the eggs were delivered to the original carrier in good condition and that their arrival at Minneapolis in bad condition was due to lack of ordinary care on the part of the carrier, having in mind the rule that compliance with the shipper's instructions as to protective service is a complete defense against a charge of negligence in connection with such service.

It is the contention of defendant that plaintiff failed to make out a case against it for two reasons: First, that the evidence does not show that the eggs were in good condition when delivered to the carrier at Pittsburgh and that, on the contrary, plaintiff's own evidence showed conclusively that a substantial percentage of the eggs were either moldy or putrid before they were broken and processed at Grand Rapids; second, that the evidence is conclusive in its favor in regard to its compliance with the protective measures required by plaintiff's shipping instructions.

■ Defendant's argument is persuasive that plaintiff's evidence, as given by his own experts, showed conclusively that part of the eggs, at least, were putrid or moldy when they were originally broken and packed and that the testimony left to pure speculation the question whether the sour eggs became such as a result of slow freezing in the original process or as a result of melting thereafter. The experts, who tested the eggs and who were plaintiff's witnesses, testified that certain of the cans which they examined emitted an odor which would only be given off by eggs that were moldy or putrid prior to being broken from the shells, and that others gave off an odor which clearly indicated that they had become sour

either from slow freezing or from lack of proper refrigeration. There was no contradiction of their testimony by anyone, except the broad statement by plaintiff that the eggs were fresh when shipped from Grand Rapids.

Plaintiff himself testified that his original freezing process took 72 hours:

"Q. How long is the process of freezing that they go through after you have broken them?

"A. We freeze an egg solid in 72 hours.

"Q. Do you freeze an egg solid in 72 hours?

"A. Yes.

\* \* \* \* \*

"Q. And you say it takes 72 hours to freeze them completely there?

"A. 72 hours."

His experts testified that there was danger of souring the eggs if the process took more than 24 hours to freeze them solid. The evidence was therefore practically conclusive that a substantial part of the eggs were putrid or moldy before they were broken and that the souring may have taken place in the slow-freezing process employed by plaintiff.

■ The consignor's instructions in regard to refrigeration were as follows:

"Car initially iced to capacity with crushed ice and 10% salt. Reice at Chicago adding 10% salt. Oftener if delayed."

The evidence is conclusive that the refrigerator car in which the eggs were shipped was precooled at Pittsburgh and iced to capacity with 10 percent salt when it was loaded there. There is no evidence of any delay in the shipment. On the contrary, the evidence is conclusive that the car was expeditiously handled and arrived in Minneapolis six days after leaving Pittsburgh. It is plaintiff's argument that it was not properly re-iced at Chicago and that no salt was used with the ice which was added there. He bases his charge of negligence on this contention. Defendant offered the

testimony of the employes who re-iced the car at Chicago. The man in charge of that work testified that he added 2,800 pounds of crushed ice in three layers with 280 pounds of salt apportioned among the layers. This amount of ice brought it up to the capacity of the bunkers, which was approximately 10,600 pounds in the two bunkers with which the car was equipped.

These bunkers are at the ends of the car and consist of large screen mesh containers protected by wooden partitions which extend completely across the car. The screen mesh is two inches in from the walls of the car and from the partitions. Each of the bunkers is 2 feet 7½ inches in horizontal width across the ends of the car. Beneath the bunker the car is equipped with a grating, which permits the circulation of air and the drainage of water through two drains at each end of the car. These drains contain air traps to prevent the entrance of warm air from outside the car. The inside height of the car from the floor racks to the ceiling is 7 feet 3¾ inches. The wooden partitions built crosswise of the car for the protection of the bunker screens do not, however, reach completely to the floor. They extend only to within 14 inches of the car ceiling, which would leave the top of the partition 6 feet 1¾ inches above the floor racks. Ice and salt are put into the bunkers from the top of the car through appropriately insulated hatches or trap doors in the roof. Salt is used when refrigeration, as distinguished from mere cooling, is desired.

The uncontradicted expert testimony is to the effect that even if the car were properly precooled before being loaded the addition of 10 percent salt to the crushed ice would not reduce the temperature in the bunkers to a point lower than 20 degrees Fahrenheit and that the temperature at the middle of the car would not be below 40 degrees Fahrenheit. To maintain a temperature of 20 degrees at the middle of the car a 25 percent salt mixture would be necessary.

The cold air circulates from the bottom of the bunker through the space below the wooden partition to the center of the car, rising in temperature about 20 degrees progressively to a point where it

meets the cold air circulating from the other bunker. Thence it rises and returns to the top of the bunkers for recooling. Constant circulation through the bunkers is thus maintained.

Against positive testimony on the part of defendant that the car was re-iced at Chicago in accordance with the instructions of the consignor, plaintiff offered the testimony of Carl E. Swanson, the superintendent of the Booth Cold Storage Company, who opened and examined the car at the Booth plant upon its arrival in Minneapolis. Upon opening the car through the doors at the middle of it, he found a temperature of 40 degrees and that some of the cans were thawed and some covers were off. Consequently, he notified the consignee, who, on the following day, examined the car and refused to accept it. Swanson's testimony was to the effect that he could not satisfactorily examine the ice bunkers through the hatches at the top of the car because the Booth dock was under a structure which made it so dark that he could not get a good view of the bunker from above. For that reason, he made no examination for salt from the top. He testified that by standing on tiptoe on the floor grating inside the car he could look over the top of the partition and get a view of the ice in the bunkers, which he said was down about 12 inches from the top of the car. This left about two inches of ice exposed above the partition. Consequently, Swanson had a view of the ice of little more than two inches in depth. He said that the ice appeared to be in large, irregular chunks, some of which were as much as a foot across horizontally. He was unable to see what the depth of the pieces was, but he said that he saw no evidence of salt on the top of the ice. He admits that he made no examination of the water that was draining from the bunkers, which he admitted would have been the proper way to determine whether salt had been used. From this examination he concluded that the car had not been iced at Chicago with crushed ice. His opinion was that the ice used was chunk ice, which would be larger and would not have the refrigerating value of crushed ice. His failure to see from the position he was in any holes in the ice indicated to him

that no salt had been used with the ice at Chicago. He admitted on cross-examination that the ice was within 12 inches of the top of the trap door or hatch through which the ice is placed in the car and that he was a man six feet one inch in height, which would bring his eyes below the top of the partition unless he stood on tiptoe. It seem incredible that he could make a competent inspection of the top of the ice if it was two inches above the partition when he had to stand on tiptoe to see over the partition. He admitted that crushed ice, in melting, as a result of the application of salt, congeals into cakes and 'that it might form pieces as large as a foot or more. He had no experience in icing cars, and he did not know the size of the chunks classed as crushed ice, which other testimony in the case showed to be about the size of a man's fist or about four inches in diameter.

In connection with the salt content, Swanson admitted that he did not test the water from the drains by tasting it and that no one else in his plant did so, but that, had that been done, it would have definitely established whether salt had been used. He admitted that if he had been painstaking in his examination he would have so tested the water. He did not examine the ice through the opening at the bottom of the partition, but said that there were no chunks of salt on the floor under the bunker. He admitted that the water drained off that area and carried salt with it.

In our view of the evidence, Swanson's opinion that the car was not iced with crushed ice or salted according to instructions at Chicago was based upon so superficial an inspection as to deprive it of any weight as evidence. It was entirely broken down by his admissions on cross-examination, and no verdict could be sustained by it. The testimony of the man who iced the car at Chicago was that salt was put on the ice when he had put in about one-third of the ice. More salt was put in when two-thirds of the ice had been put in and again after the bunker was filled to capacity. The fact that Swanson found the temperature of the car at the middle to be 40 degrees Fahrenheit when it arrived in Minneapolis corroborates, with practically conclusive force, the testimony that

10 percent salt was used at Chicago. That temperature is exactly what the undisputed expert testimony said it should be at that point if 10 percent salt was used. Had 25 percent salt been required with the ice, a temperature of zero in the bunker and 20 degrees above that at the middle of the car-lading space would have been produced. It is significant that when plaintiff shipped his eggs from Grand Rapids, Michigan, to Pittsburgh in December 1943 he required 25 percent salt. Evidently plaintiff's agent in Pittsburgh improvidently ordered the 10 percent salt for the shipment to Minneapolis.

In the face of the overwhelmingly convincing evidence of his own witnesses, as well as the undisputed testimony of a well-qualified man who knew refrigeration and refrigerator cars, plaintiff's bald statement that the eggs were fresh when shipped to Pittsburgh and that 10 percent salt produced sufficient refrigeration falls outside the limits of credibility. The evidence is practically conclusive that the consignor's instructions were followed to the letter in the re-icing at Chicago. The trial court was right in ordering judgment notwithstanding the verdict. Brulla v. Cassady, 206 Minn. 398, 289 N. W. 404.

Order affirmed.