FOURNET, Justice.
 

 The plaintiff, Valentin Rivera, is appealing from a judgment of the lower court dismissing his suit to recover the value of a shipment of rice purchased from DalGar Rice Mill, Inc., of Crowley, Louisiana, and destroyed by fire in New Orleans while in transit to Puerto Rico under through export bills of lading issued by the agent of the Texas and New Orleans Railroad Company in Crowley.
 

 The Dal-Gar Rice Mill, Inc., on January 25, 1941, delivered to the Texas and New Orleans Railroad Company, freight pre
 
 *974
 
 paid, 600 pockets of Choice Blue Rose Milled Rice Coated, each pocket containing approximately 100 pounds, for through shipment and delivery to the order of DalGar Rice Mill, Inc., (notify V. Rivera S. en C.), at Aguadilla, Puerto Rico, via the railroad’s line to New Orleans and from thence by Waterman Steamship Line to Aguadilla, 200 pockets being marked for shipment by the steamer Kofresi sailing on March 14, 1941, 200 pockets for shipment on the steamer Afoundria sailing on March 28, 1941, and the remaining 200 pockets for shipment by the steamer Maiden Creek scheduled to sail on April 11, 1941. The railroad accordingly issued its three through export bills of lading to cover the three shipments. These consignments reached New Orleans on January 26, 1941, and the following day, during the course of their through transit, were removed from the freight car in which they had been shipped and were stored by the railroad in its freight depot, a warehouse (leased in part to the Bienville Warehouse Corporation, a subsidiary of the railroad) at Bienville street and the river. Notice of the arrival. of the consignments in New Orleans was addressed to the Waterman Steamship Company on January 26, 1941, and was received by that company in due course. No notice of the arrival of the rice in New Orleans was given to either the plaintiff or the Del-Gar Rice Mill, Inc., and the steamship company was not apprised in its notice just where the rice had been placed. On March 11, 1941, the steamship, company mailed to 'the railroad a written request for the delivery to the vessel of the consignment to be shipped via its steamer Kofresi, scheduled to berth at the foot of Cleste and Market streets, some two miles from the warehouse, and to sail on March 14. These instructions for the delivery of the rice to the vessel were received by the railroad on the following day. At 8 o’clock that night the warehouse in which the rice was stored caught fire and certain of its contents, including these consignments of rice, were completely destroyed.
 

 During the course of the shipment and prior to its destruction, the plaintiff, a wholesale grocer doing business at Aguadilla under the firm name of V. Rivera S. en C., by acquiring the three bills of lading, became the owner of the rice and,after due demand, instituted this suit to recover the value thereof from the railroad and the warehouse corporation, in solido, as common carriers; in the alternative, as warehousemen.
 

 The railroad concedes that the foregoing facts are substantially correct but contends -that under the terms and conditions of the bills of lading, which together with the applicable tariffs and classifications lawfully on file with the Interstate Commerce Commission constitute the contract between the parties, and more particularly under those provisions thereof contained in subdivisions 1(b), 5(a), and 10(a) of Part I, when notice of the arrival of the shipment in New Orleans was mailed to the
 
 *976
 
 steamship company (the connecting carrier) on January 26, 1941, its relationship to the shipper ceased to be that of a common carrier and became that of a warehouseman only. It denied liability in that capacity because of lack of negligence on its part in causing the fire but admitted in brief that since the rice was stored in its own warehouse and was under its exclusive supervision and control and not that of the warehouse corporation, it was solely responsible for the loss if found tp be liable as a warehouseman.
 

 In a separate answer the Bienville Warehouse Corporation denied any and all liability.
 

 While a bill of lading is generally understood to be a written acknowledgment of the receipt of goods and the contract in which is contained the agreement for their carriage and delivery at a specified time to a designated person or his order, one of its most important functions is “to give formal expression to the stipulations and conditions under which the carrier seeks to obtain a modification or limitation of the liability that otherwise would be imposed upon it under the common law.” In the Matter of Bills of Lading, 52 I.C.C. 671, 681.
 

 In order, to properly evaluate these modifications, it is necessary that a brief statement be given of the development under the common law and in this country of the liability of common carriers.
 

 The common law liability of carriers was laid down in England as long ago. as 1703 by Lord Holt in the famous case of Coggs v. Bernard, 2 Lord Raymond, 909, wherein he said that where “a delivery to carry” is made "to one that exercises a public employment * * * and he is to have a reward * * *. The law charges this person thus intrusted to carry goods, against all events, but acts of God, and of the enemies of the King.”
 

 As commerce moved forward on rapid strides and the importance of the carrier’s role became increasingly apparent, the carriers, alarmed at the degree of liability imposed upon them in the transportation of commodities, began to cast about for means of escaping its all-inclusiveness and to contrive ways of diminishing it. The English courts early gave recognition to the right of the carriers to restrict their common law liability, even sanctioning the very simple expedient devised by them of posting notices in conspicuous places informing the public of the limitations they intended to place upon this liability. The apparent evils that inevitably grew up around such a practice resulted in a Parliamentary enactment in 1854 providing that the common law liability of carriers could only be limited by a specific contract with the shipper.
 

 In this country, the mere posting of notices of limitation of liability by the carriers was never sanctioned, although the rule was early established that such limita
 
 *978
 
 tions could be effected by the establishment of the contractual relationship between 'the carrier and the shipper. These contracts have evolved into the bills of lading that form so important a part of the every-day commerce of modern times and they serve three distinct functions: (1) A receipt for the goods; (2) the contract under which the goods is carried; and (3) documentary evidence of title to the goods.
 

 Despite the fact, however, that carriers were permitted to limit or restrict, or even to extend and enlarge, their common law liability, so much confusion arose in this country because of the varied enactments in the different states touching on this matter and the diversity of the construction placed on these enactments by the states and the federal courts that Congress, around the turn of the century, stepped in to correct the situation under its authority to regulate commerce by adopting the Car-mack amendment in 1906, 49 U.S.C.A. § 20 (11,12). In this amendment it was provided that common carriers receiving property for transportation from a point in one state to a point in another would be liable for any loss, damage, or injury to such property caused by it or by any other carrier to which the goods was turned over, any provision to the contrary in receipts, contracts, rules, or regulations notwithstanding. The effect of this amendment was to hold the initial carrier liable as having contracted for through carriage to the point of destination, using the lines of the connecting carriers as its agents, and its purpose was to circumvent the usual provisions incorporated in bills of lading limiting the carrier’s liability to loss or damage occurring on its own line. The shipping public was thus relieved of the burden of proving upon whose line the loss or damage occurred, practically an impossibility in many instances.
 

 In 1915 Congress enacted the first Cummins amendment, extending the provisions of the Carmack amendment to the transportation of goods within the territories of the United States, the District of Columbia, and goods exported to adjacent foreign countries. This amendment also invalidated all limitations or attempted limitations of the carrier’s liability for loss, damage, or injury to goods by making the carrier liable for the
 
 full actual
 
 loss, damage, or injury caused by it or by any of the connecting carriers, irrespective of any contractual provisions that such loss would be restricted to the
 
 asserted value.
 

 The following year the second Cummins amendment was enacted permitting the carrier to limit its liability to the stated value of all property except ordinary livestock and that property requiring the establishment of particular rates dependent upon the agreed value. This meant that the first Cummins amendment was still applicable to livestock and to those particular classes of property requiring special rates and that as to them carriers still could not limit their liability to less than the full actual value.
 

 
 *980
 
 It is obvious, therefore, that there has really been very little relaxation of the common law rule or of the strict accountability to which the carrier of goods was held under the common law and that even today the carrier is considered to be the insurer of the goods intrusted to its care and custody for transportation and is, thus, liable for all loss, damage, or injury to such goods while they remain in its possession in its capacity as a common carrier.
 

 The question that has given rise to the greatest number of disputes between carriers and shippers and that has been the most prolific of litigation is the one requiring the determination of just when the carrier ceases to hold goods as a common carrier although it is still in its possession. In other words just when does the carrier’s extraordinary liability and obligation as an insurer of the goods cease and that of a warehouseman only begin ?
 

 This question, according to the accepted rule, pan only be determined by applying the contractual provisions in the bill of lading under which the goods were shipped to the facts and circumstances of the case.
 

 Each of the bills of lading in this case is labeled “Uniform Through Export Bill of Lading (Prescribed in Interstate Commerce Commission Orders * * * in Docket No. 4844.)” It is specified on their face that the property described therein is “To be cax-ried to the port (A) of New Orleans, La. and thence by Waterxnan SS Line to the port (B) Aguadilla, P.R.” and is there to be delivered in like good order axid condition as it was received by the carrier. The fixed and separate rates for the inland carriage and the ocean or on-carrying transportation is also specified. Following this is the provision: “In consideration of the rate of freight herein named (that of the inland carrier is fixed at .14V2{5 per one hundred pounds gross weight and that of the on-carrier at .33^) it is hereby stipulated that the sexwice to be performed hereunder shall be subject to the contract terms and conditions, whether printed or written, herein contained, and said terms and conditions are hereby agreed to by the shipper and by him accepted for himself and his assigns.” (Brackets ours.)
 

 Immediately followixig is the heading “Contract Terms and Conditions,” under which the bills are divided into three parts. Part I deals with the service to be furnished until delivery at Port A (New Orleans)* Part II deals with the sexwice after delivery at Port A and until delivery at Port B (Aguadilla, Puerto Rico). Pai't III has reference to the sexwice to be furnished after delivery at Port B and xxntil delivery at the ultimate destination. Obviously the only part of the bills with which we are here concerned is Part I.
 

 The very first stipulation to be found under Part I contains the provision that
 
 “The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or dam
 
 
 *982
 

 age thereto except as hereinafter provided.”
 
 (Italics ours.)
 

 The other provisions under Part I that are pertinent to a decision in this case are as follows:
 

 “1(b) * * * The carrier’s liability shall be that of a warehouseman, only, for loss, damage, or delay caused by fire occurring after the expiration of the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided) after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at the port of export, or tender of delivery of the property to the party entitled to receive it, has been made * *
 

 “5(a) Property not removed by the exporting earner, or the party entitled to receive it, within the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at port (A) has been duly sent or given, and after placement of the property for delivery at port (A), or tender of the property for delivery upon order of the party entitled to receive it has been made, may be kept in vessel, car, depot, or place of delivery of the carrier or warehouse, subject to the tariff charge for storage and to the carrier’s responsibility as a warehouseman, only, or, at the option of the carrier, may be removed to and stored in a public or licensed warehouse at port (A), or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage.”
 

 “10(a) No carrier shall be liable for delay not occurring on its own line, or not the result of its negligence, nor in any respect other than as warehouseman, while the property awaits further conveyance and after proper tender of delivery to the next connecting carrier has been made, and if the whole or any part of the property specified herein be prevented by any cause from going from the port of export in the vessel for which intended, the carrier hereunder then in possession is at liberty to forward said property by another vessel of the ocean carrier, or, if deemed necessary, by any other vessel, dispatching notice thereof to the shipper and consignee.”
 

 “(b)
 
 It shall be the duty of the carrier by railroad to deliver such property to the vessel as a part of its undertaking as a common carrier.”
 
 (Italics ours.)
 

 It therefore follows that under the express law and the terms of the contract the defendant railroad is liable as a common carrier for the loss of the property here involved unless its liability as such has ceased and it has become liable, as contended by the railroad, as a warehouseman only under the conditions stipulated in sub-divisions 1(b), 5(a), and 10(a).'
 

 
 *984
 
 All bills of lading, being the contract between the parties, are subject to the rules governing the interpretation of contracts, and consideration must, therefore, be given to the entire context of the instrument rather than to a single phrase or clause, and all of these clauses are interpreted the one by the other, giving to each the sense that results from the whole. See Articles 1945-1962 of the Revised Civil Code.
 

 In order to fully understand and determine the meaning of the provisions contained in sub-divisions 1(b), 5(a), and 10 (a) of Part I of these bills of lading, they must be read in connection with the other provisions of the contract, as well as with the' applicable tariffs and classifications on file with the Interstate Commerce Commission.
 

 In I.C.C. Order No. La.-292, dealing with the demurrage, storage, and handling charges that are applicable in this case, it is stipulated that the free time allowed in New Orleans consists of 168 hours, or seven days. The freight tariff under which the rice moved (I.C.C. No. La.-274, Supplement 8) contains the provision that “rates published in this Tariff apply to shipside, that is, such rates include handling (unloading) from cars to docks or wharves * * * " also switching charges * * * to docks or wharves from terminals of inbound line haul carrier.” The term
 
 "shipside”
 
 is defined in I.C.C. Order No. La. — 292 to mean
 
 "the placement for delivery to
 
 or receipt from ships, barges or other water craft, according to the customs or practices of the port.” The local terminal charges tariff of the railroad, containing the rates, rules, and regulations governing switching, dryage, and handling (I.C.C. No. La.-287) contains the provision in Item No. 840 that “In the absence of specific export rates * * * to New Orleans * * * the domestic rates to the ports named * * * will apply to shipside and include the cost of making such delivery on export traffc to * * * Porto Rico * * * from * * * Louisiana (West of the Mississippi River).” In sub-division (b) of this item we find the provision: “In the absence of rates specifically published to shipside, New Orleans * * * rates published by the Southern Pacific Lines (this includes the defendant railroad) * * * to New Orleans * * * will include all charges * * * in movement of and delivery to shipside at New Orleans * * * on export traffic to * * * Porto Rico.” In Item No. 910 is contained the further provision that “Shippers or their agents will not be permitted to perform services of loading or unloading on shipments covered by through * * * export bills of lading.” See, also, page 5 of I.C.C. Order No. La.-292 to this same effect. (Italics and brackets are ours.)
 

 Simply stated, these provisions
 
 in
 
 the bills of lading — when considered with the object of the contract, the provisions in clause 10(b) above quoted that “It shall
 
 *986
 
 be the duty of the
 
 carrier by railroad
 
 to deliver such property to the vessel as a part of its undertaking as a common carrier,” and the applicable tariffs and .classifications which form a part of these bills of lading — declare that the liability of the railroad as a common carrier shall cease when the railroad has completed its undertáking under these bills and tariffs, that is, when it has given due notice of the arrival of the property at the port of export and has also completed its undertaking with respect to the delivery of this property at shipside or has made a tender of its delivery to the party entitled to receive it. It is only then that the free time provided for in the tariffs (seven days) begins to run and it is only at the expiration of this free time, if the on-carrying carrier has failed or refused to take the delivery thus tendered, that the inland carrier’s liability becomes that of a warehouseman under Section 1(b) of Part I of the bills of lading. If the property is not removed by the exporting carrier within this free time, then the provisions of sub-division 5(a) of Part I become operative and the railroad is given the choice under this clause of storing the property itself (subject to the tariff charges for storage) and holding it as a warehouseman only, or of removing it to a public or licensed warehouse at Port A and there having it stored at the owner’s expense and freeing itself of any liability whatsoever (even as a warehouseman). The provisions found in clause 10(a) do not add anything to these other two provisions. This clause simply complements the other two by according to the carrier, in the event the property is prevented from leaving the port on the vessel intended, the right of either forwarding it on another vessel of the same ocean carrier or of forwarding it by any other available vessel, with due notification of such shipment to the shipper and the consignee.
 

 That the construction we have thus put on these clauses reflects the true intent of the parties in this case is, in our opinion, eloquently demonstrated by the reasons assigned by the Interstate Commerce Commission in refusing to recommend the form suggested by the carriers themselves and in recommending, instead, a clause identical with that found in sub-division 1(b) of Part I of these bills of lading, which reasons are, in part, as follows: “As a prac^ tical matter, it is not only essential that the shipper should have notice of the arrival of his goods, but that the carrier should place them in an accessible position to be received by him and removed. Until they are so placed and tendered for delivery it is obviously impossible for the consignee to receive and remove them
 
 and the carrier can not reasonably be relieved of its common-law liability until it has so placed or tendered the goods for delivery.
 
 If the consignee, or other party upon whom is the duty to receive the goods, does not remove them within a reasonable time thereafter, the carrier’s common-law liability should cease arid become that of
 
 *988
 
 a warehouseman only. The consignee should have a reasonable time within which to remove the goods after notice has been duly received or given that they are
 
 ready for delivery,
 
 and
 
 the carrier's notice to the shipper should be one which not only notifies him of the arrival of the goods, but also that they are ready for delivery u
 
 * The commission therefore concluded that “the consignee is within his legal rights if he avails himself of
 
 the full time allowed by the tariffs
 
 (free time) and the carrier can not be presumed to be released from its liability, as such, while the goods are continued in its custody and the shipper, in accordance with the privileges specifically accorded under duly published and filed tariffs, incurs no penalties.” (Brackets and italics ours.) 52 I.C.C. 671.
 

 In other words, as simply stated by Dobie in his authoritative work on Bailments and Carriers,
 

 “When goods are received by a carrier to be transported to a point beyond its own line, under circumstances which * * * make the initial carrier liable as an insurer only to the end of its own line, there is nevertheless superadded to its duty as a common carrier over its own line that of delivering the goods safely to the connecting carrier. This duty on the part of the initial carrier is an obligation implied in receiving the goods consigned to a point beyond its own line. Until this duty is performed, the first carrier continues liable as an insurer. The delivery to the connecting carrier, too, must be an actual delivery, or acts which are so far equivalent to a delivery as to make the next line assume the relation of a carrier to the goods. The first carrier does not, by unloading the goods at the end of its line, become a mere warehouseman. The shipper who delivers his goods to a common carrier has a right to understand that the liability of an insurer is upon some carrier during the whole period of the transit. The duty of one carrier is not discharged, therefore, until it has been imposed upon the succeeding carrier, and this is not done until there is an actual delivery of the goods, or at-least such acts as are in law equivalent to a tender of delivery.
 

 “The owner loses sight of his goods when he delivers them to the first carrier, and has no means of learning their whereabouts till hé or the consignee is informed of their arrival at the place of destination. At each successive point of transfer from one carrier to another, the goods are liable to be placed in warehouses, and during this storage the danger of injury to, or loss of, the goods, either from collusion of the carrier or other cause, is equally as great as while the goods are actually in transit. Again, the storing of the goods under such circumstances is to be regarded solely as an incident of, and accessory to, their actual transportation.” Section 145, pages 447-449.
 

 It is our opinion, therefore, that the arrival of the rice in New Orleans, notice
 
 *990
 
 of such arrival to the Waterman Steamship Line, and the placement of this rice in its warehouse by the defendant railroad did not constitute the notice and placement for delivery or tender contemplated by clause 1(b) of Part I of the bills of lading — clauses 5(a) and 10(a) having no application here — under which they were transported to operate as a release of the carrier’s common law liability as insurer of the goods. The carrier is, therefore, liable to the plaintiff for the loss here complained of.
 

 The case of Courteen v. Kanawha Dispatch, 110 Wis. 610, 86 N.W. 176, 177, 55 L.R.A. 182, decided by the Supreme Court of Wisconsin in 1910, and relied on by the defendant railroad, is not applicable to this case from a factual standpoint and is not pertinent from a legal standpoint. In that case the court remarked: “The defendant also admits that it had charge of this property, and had not fully performed its contract; that it remained for it, upon arrival of the steamship, to make delivery of the goods.
 
 Under this concession, unless the •common-law liability had been modified by the contract, the defendant would be liable for the loss by fire.”
 
 The court said, however: “In the bill of lading there was an express stipulation against such liability,” and concluded that since such exemption from liability was valid under the law of Wisconsin, there could be no liability unless the loss occurred because of the carrier’s negligence, which it found was not the case. (Italics ours.)
 

 The railroad’s counsel in their argument on appeal here both orally and in brief have raised the question of the right of the plaintiff to prosecute this suit because it received the full value of the alleged loss from the Norwich Union Fire Insurance Society, Limited, though an effort was made by the plaintiff to convert the transaction from a pure payment of insurance under the policy to a loan.
 

 This question is apparently being raised for the first time on appeal for we fail to find that such an issue was specially pleaded in the lower court. However, even if it may be said that it was pleaded specially or that the pleadings were enlarged because of the introduction of evidence on the subject, similar arrangements between the insured and the insurer have been upheld by the Supreme Court of the United States. See Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 55, 63 L.Ed. 170, 1 A.L.R. 1522.
 

 In disposing of the identical issue raised here, Justice Brandéis, as the organ of the court in that case, said:
 

 “Upon delivery of this and similar agree'ments, the shipper received from the insurance companies, promptly after the adjustment of the loss, amounts aggregating the loss; and this libel was filed in the name of the shipper, but for the sole benefit of the insurers, through their proctors and counsel, and wholly at their expense. If, and to the extent (less expenses) that, recovery is had, the insurers will receive
 
 *992
 
 payment or be reimbursed for their so-called loans to the shipper. If nothing is recovered from the carrier, the shipper will retain the money received by it without being under obligation to make any repayment of the amounts advanced. In other words, if there is no recovery here, the amounts advanced will operate as absolute payment under the policies.
 

 “Agreements of this nature have been a common practice in business for many years. * * * It is clear that if valid and enforced according to their terms, they accomplish the desired purpose. They supply the shipper promptly with money to the full extent of the indemnity or compensation to which he is entitled on account of the loss; and they preserve to the insurers the claim against the carrier to which by the general law of insurance, independently of special agreement, they would become subrogated upon payment by them of the loss. The carrier insists that the transaction, while in terms a loan,
 
 is in substance a payment of insurance;
 
 that to treat it as if it were a loan, is to follow the letter of the agreement and to disregard the actual facts; and that to give it effect as a loan is to sanction fiction and subterfuge. But no good reason appears either for questioning its legality or for denying its effect. The shipper is under no obligation to. the carrier to take out insurance on the cargo; and the freight rate is the same whether he does or does not insure. The general law does not give the carrier, upon payment of the shipper’s claim, a right by subrogation against the insurers. * * * The insurer could not have been obliged to pay until the condition of their liability — i. e., nonliability of the carrier — had been established. The shipper could not have been obliged to surrender to the insurers the conduct of the litigation against the carrier, until the insurers had paid. In consideration of securing them the right to conduct the litigation, the insurers made the advances. It is creditable to the ingenuity of business, men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice.” See, also, Dejean v. Louisiana Western R. Co., 167 La. 111, 118 So. 822. (Italics ours.)
 

 While the plaintiff in a supplemental petition sought to recover $2,838, the value of the rice lost in accordance with its market value at Aguadilla, Puerto Rico, on the approximate date such shipment would have arrived there had it not been destroyed, he now concedes, as he-must under the jurisprudence, that he is entitled to recover only the amount of $2,-5S0, the price at which the rice could have been replaced in New Orleans at the time of its destruction. This is the amount he prayed for in his original petition. Since the defendant failed to adjust and pay the-plaintiff’s claim within 30 days after it was filed with the railroad on April 17, 1941, however, the plaintiff is entitled to recover, under the provisions of Act No. 29 of 1908,.
 
 *994
 
 legal interest at the rate of 5% per annum on this amount from the date of such claim, plus the penalty of $50 on each of these three shipments, as provided in the act.
 

 We think, too, that the plaintiff is entitled to recover its claim for $198.99, representing the prepaid freight collected by the railroad for the transportation of this rice from the port of New Orleans to Aguadilla, Puerto Rico, with legal interest from the date of demand.
 

 For the reasons assigned the judgment of the lower court is annulled and set aside and it is now ordered, adjudged, 'and decreed that there be judgment in favor of the plaintiff, Valentin Rivera, and against the defendant Texas and New Orleans Railroad Company in the sum of $2,748.99, with 5% per annum interest from April 17, 1941, until paid, and for the additional sum of $150. All costs of this suit are to be paid by the defendant railroad.