**GOLTZMAN et al.   v.   ROUGEOT et al.**
**Civ. A. No. 3263.**

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Aug. 2, 1954.

William R. Tete and Jones, Kimball, Harper & Tete, Lake Charles, La., for plaintiffs.

Alan B. Cameron, Orange, Tex., Porter & Stewart, Lake Charles, La., for defendants.

DAWKINS, District Judge.

Plaintiffs, as citizens of Louisiana, sued defendants, alleged to be citizens of Texas, in damages for the loss of a barge load of scrap metal alleged to have been caused by the negligence of defendants or their employees, in undertaking to transport it wholly within the State of Louisiana along the Intracoastal Canal. The action was brought under Act No. 132 of the Louisiana Legislature of 1948, LSA–R.S. 13:3479 et seq., which, in substance, permits the suing of nonresident owners or operators of ships or vessels upon the navigable waters within the state, and the serving of process upon the Secretary of State.

Defendants filed a plea to the jurisdiction of this Court claiming primarily the unconstitutionality of the state statute on the ground that it denied due process, Art. 1, Sec. 2 of the Constitution of the State and Sec. 1 of the 14th Amendment to the Federal Organic Law. It was further contended that one of the plaintiffs, Samuel Goltzman, was a citizen of Texas, the same as the defendants, and therefore no diversity. In addition, defendants charged the fair value of the property lost did not exceed $3,000, the minimum jurisdiction of this Court. The plea also embraced a claim [1(b)] that defendant had not received notice of the suit as required by the Act, but in stipulations between the parties this contention was "abandoned as having been subsequently cured by proper notice * * *". Otherwise, it was further stipulated that the plea to the jurisdiction should be submitted on briefs and referred to the merits, with the understanding that when the case is heard " * * * evidence will first be adduced to establish the facts pertaining to the jurisdiction". Later at a pre-trial hearing before my late associate, Judge Porterie, on April 25, 1952, it was agreed that the entire matter of jurisdiction, and the constitutionality of Act No. 132 of 1948 should "be referred to the merits". Judge Porterie having died on March 24, 1953, the case was tried and submitted on briefs later to be filed and the record was transmitted to the undersigned on May 16, 1954. Thus, except for the jurisdictional amount and the citizenship of Sam Goltzman, the plea is one of the constitutionality of the State statute.

It appears to be conceded that the present measure was an attempted adaptation from the motor vehicle Act, No. 86 of 1928, LSA–R.S. 13:3474, 13:3475, to water craft. The defendants seek to differentiate between the two on the ground that the motor vehicle act, as well as similar statutes in other states, was upheld under the police power for reasons of vital necessity or safety upon the highways; whereas, the navigable waters within and touching the states are natural highways (the Intracoastal Canal involved here having been constructed by and being now owned by the United States) subject to free use by everyone; and further, that in most of the cases construing the motor vehicle statutes, the defendants were foreign corporations which could be excluded from the State, except upon the latter's terms, while this principle has no application to individual citizens.

The constitutionality of the motor vehicle statute of Louisiana was sustained by this Court in Moore v. Payne, D.C., 35 F.2d 232, as were similar statutes in the other states, Kane v. State of New Jersey, 242 U.S. 160, 37 S.Ct. 30, 61 L.Ed. 222; Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091; Tublitz v. Hirschfeld, 2 Cir., 118 F.2d 29; Andrews v. Joseph Cohen & Sons, Inc., D.C., 45 F. Supp. 732, and its provisions are sufficiently set out in the Moore case without the necessity of repeating them here. It simply declares that the exercise by "non-residents of the rights and privileges conferred by existing laws" of "motor vehicles on the said highways * * * shall be deemed equivalent to an appointment * * * of the Secretary of the State" as their "lawful attorney for service of process * * *." In the present instance the law declares that "the operation, navigation or maintenance by a non-resident * * * of a boat, ship, barge or other water craft" in navigable waters of the State " * * * shall be deemed equivalent to an appointment * * * of the Secretary of State * * * for service of process * * *" and the method of service is the same in both statutes.

It is argued by defendants that the hazards incident to the operation of motor vehicles upon the highways are such as to justify, in fact to compel, the exercise by the states of their police power to insure safety for all users, but that no such compelling consideration exists in the operation of water craft. As to the claimed distinction between state owned highways and navigable

water courses, it is not believed that the difference in ownership, as between the states and the Government makes any difference. The latter are arteries of travel and commerce whose users within the borders of the states enjoy the same police protection as those upon the highways and as pointed out by the complainant, the dangers of collisions, explosions and damage to other craft, wharves and similar shore structures bordering thereon, are serious though perhaps not as numerous as accidents upon the highways. The difference therefore is one only of degree which furnishes no ground for holding the present Act unconstitutional. The states have a wide discretion to determine when and in what circumstances they will exercise their police power and the courts will not interfere except in cases of clear and arbitrary abuse. 16 C.J.S., Constitutional Law, § 175, page 541 et seq.; Sugg v. Hendrix, 5 Cir., 142 F.2d 740. It is believed therefore that the assailed statute is constitutional.

■ As to the jurisdictional amount, the complaint alleges that the value of the scrap metal lost through the negligence of defendant was the sum of $8,-050. It consisted principally of deteriorated pipe discarded by the Shell Oil Company for which the sum of $180 was paid, plus the cost of cleaning up its yard after the material was removed, at a cost of approximately $400. It was loaded on two barges, one steel and the other wood, which, according to witnesses familiar with their capacities, were capable of carrying maximums of not more than 25 to 30 tons each. Men of experience in such matters, including agents of Shell, testified there were about 25 to 30 tons altogether. There were several bidders for the scrap but that of one Reed was the highest. Reed testified he paid the owner the sum stated, cleaned up the yard and sold it to plaintiffs for $1,500. Defendant agreed to haul it to Lake Charles from Black Bayou for $400. Julius Bourque, testifying for plaintiff, estimated that there were between 100 and 110 tons of the scrap, including pipe but only about one-third was actually delivered to plaintiffs in Lake Charles. Further that this was the "worst pipe in the pile at Black Bayou." This witness afterwards went into the scrap business for himself and was no longer working for plaintiffs at the time he testified. He estimated that about 35 tons had been loaded and delivered on the steel barge.

The testimony as to the quantity of material purchased is in serious conflict, some witnesses for plaintiff fixing it at the figure above stated of 100 to 110 tons; while those for defendant say there were only about 25 to 30 tons. They are also wide apart as to the value, one of the plaintiffs, Sam Goltzman, having testified that 30 to 35 tons were sold from that delivered by the steel barge for $67.50 per ton. On the other hand, defense witnesses fix the value as a whole at about $25 per ton. There is also dispute as to whether there was more and better material on the wooden barge which sank than on the steel one which was delivered. In view of plaintiffs' evidence tending to show a value of the material in excess of $3,000, although it admittedly paid only $1,500 for the whole, there appears to be an issue of fact as to value, which, in the absence of a clear showing that in no event could it have been sufficient to come within the minimum jurisdiction of this court, the allegations of the complaint control. Therefore the plea to the jurisdiction based upon amount in controversy is overruled.

■ Sam Goltzman testified that he had been living at 1235 12th Street in Lake Charles since he went into the scrap business in that city some years earlier but that he bought a home in Houston, Texas, in August after the suit was filed on April 5, 1951. If he was a citizen of Louisiana at that time this court had jurisdiction. Wichita R. & Light Co. v. Public Utilities Commission, 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124; Thompson v. Moore, 8 Ark., 109 F.2d 372; Boesenberg v. Chicago Title & Trust Co., 7 Cir., 128 F.2d 245, 141 A.L.

R. 565; Lyons v. Weltmer, 4 Cir., 174 F.2d 473; Mason v. Salter, D.C., 92 F. Supp. 627; Shreveport Long Leaf Lumber Co. v. Wilson, D.C., 38 F.Supp. 629. If it be true that his family lives in Houston, where he testified he purchased a home this would not necessarily make him a citizen of Texas. He swore that his business is all in Lake Charles where he personally lives and visits his family in Houston about twice a month. He testified further that he bought the Houston home because his wife was suffering from asthma and the Lake Charles climate did not agree with her; hence the reason for the change. A man's domicile is where he lives and maintains a permanent residence. Estopinal v. Michel, 121 La. 879, 46 So. 907, 19 L.R.A.,N.S., 759; First National Bank v. Hinton, 123 La. 1018, 49 So. 692; Caufield v. Cravens, 138 La. 283, 70 So. 226; Burke v. Massachusetts Bonding & Ins. Co., La.App., 19 So.2d 647; Shreveport Long Leaf Lumber Co. v. Wilson, supra.

Defendant further contends that plaintiffs were not the owners of the scrap when it was lost. While there is some mix-up in the testimony of plaintiff Goltzman and his witness, Reed, with respect to who paid the price to Shell and what Goltzman paid to Reed, still if their testimony is to be believed, it wound up in the hands of plaintiffs, that is all of it before it was lost, for the sum of $1,500. However, no one else is asserting any claim for its loss and Reed, the only other person who could apparently have any interest therein having testified as a witness here that he sold it to plaintiffs, would be estopped to claim it. Of course, the market value of the scrap at the time it was lost controls, but in view of the allegations of the complaint, the testimony of Sam Goltzman and his witnesses is enough to raise a justiciable issue that it exceeded $3,000. The conclusion is that upon all points the court has jurisdiction.

### On the Merits

The scrap was loaded on two barges and attached to a tug in tandem. The first next to the tug was of steel, with the second, a somewhat larger wooden barge in the rear. The combination master and pilot, one O. E. Fowler, had never qualified or been licensed either as a pilot or navigator. What he knew about piloting or navigating was picked up from practical experience of about a year from one Ed Voge. The latter testified he had been a derrick barge operator for 23 years but was never a tug pilot nor had he ever been licensed as a pilot or navigator, nor did he know anything about the rules and regulations provided for that purpose. Fowler testified "he told me what I know about it". Neither did Fowler know anything about Treasury Regulations No. 80.16(a), (e) and (k) applying to inland waterways from the Rio Grande in Texas to Cape Sable, Florida (Intracoastal Canal), as to the number and location of lights on a tug and barges included in a tow. In a discovery deposition he testified there were only kerosene lanterns on each barge, one in the approximate center of the front end of the first one and in the same position on the rear end of the second; that on the rear end being eight feet above the floor of the barge while the one on the front of the steel barge was about three and a half feet high. Yet at the trial he swore there were three lights, one at the approximate center of the rear of each barge and the third on the left front end or corner of the steel barge next to the tug. Regulation 10.16(e) required that they should be carried "at *each* end" of the barges "when being towed, single or in tandem * * * behind a steam vessel" of sufficient strength [80.16(k)] "to show all around the horizon and shall be visible at a distance of at least two miles". Regulation 80.02 declares that a steam vessel "shall include any vessel propelled by machinery * * *" which, of course, included the steam tug in this instance.

As stated above, Fowler had had only one year's experience in operating tugs and tows, but, in the meantime had engaged in many other activities having nothing to do with navigation and there

is no showing as to the frequency or extent of his serving as a pilot or navigator.

◼ Of course, the burden was upon the plaintiffs to prove the alleged negligence, but when the cargo was entrusted to defendants as carriers who undertook to transport it with their own vessels, the former having no representative aboard to see or know what happened, it was sufficient, prima facie, to show the contract of carriage and the sinking of the barge in a damaged condition. The burden then shifted to defendants to prove that they were without fault. Watkins v. Gulf Refining Co., 206 La. 942, 20 So.2d 273; Mercer v. Tremont & G. Ry. Co., La.App., 19 So.2d 270; Stell v. Briggs, La.App., 69 So.2d 82; Chicago, R. I. & P. R. Co. v. McClanahan, 5 Cir., 173 F.2d 833; Ainsworth v. Louisiana & A. Ry. Co., D.C., 84 F.Supp. 170; Litton v. Travelers Insurance Co., D.C., 88 F.Supp. 76.

On the point as to how the collision occurred, Fowler testified that he discovered a vessel approaching from his rear when it was one-fourth to one-half mile away; that the Canal where he was then stationed was approximately 300 feet wide and that he pulled over to the south bank (in the deposition, to within ten feet of the bank, but on the trial to within four feet) of the Canal, going east. The tug drew about three and one-half feet of water and Fowler testified that in handling a tow like the one involved here, he needed no help, but usually carried a single deck hand, one being on board at the time. The accident happened about 8:30 or 8:45 o'clock at night. In the discovery deposition Fowler testified that the tug behind looked him over with a spotlight when the two were about 150 to 200 feet apart and then signaled the rear tug's engineer for speed ahead, and that he, Fowler, construed this to mean he desired to pass, but that no effort was made to pull towards the center of the canal for that purpose until the rear tow was within 45 feet of the one ahead, on the same side of the canal; that when it did start

to turn it was too close to clear Fowler's tow and the rear barge of the passing tow struck the rear left end of Fowler's rear wooden barge causing it to sink. Just before the collision he and his deck hand saw it was inevitable and began preparations to abandon ship. However, when the wooden barge broke loose and started to sink he, for the first time, began sounding distress signals consisting of repeated short blasts; that the tow which had passed stopped some 200 feet ahead, the tug was detached and backed down even with the GRACIE (name of Fowler's tug) about 150 feet over towards the north bank of the canal; and that the witness or his deck hand hollered to the other tow that it had sunk the wooden barge. That the other tug without further ado then pulled forward again, connected with its tow and started on down the canal at high speed; that the two had not been close enough together to either identify the tug or anyone who was on it; that Fowler after tying up the steel barge, disconnected his own tug and tried to catch the other, chasing it about a mile, but could not do so because there was a difference in speed in favor of the other fellow's tug of some two miles (9 and 7). (Just how he knew the speed of the unknown and unidentified barge is hard to understand except to estimate by his own speed and how far he was getting behind).

◼ Plaintiffs were unable to refute these statements, but when Fowler's testimony on deposition is compared with that at trial, it is evident he attempted to cover up some of his ignorance of what was necessary in such a situation to prevent a collision, and we must conclude that he gave no sufficient signals or warning as to the danger until his rear barge had been struck; and further that his lights were inadequate. It is not possible to believe that a tow approaching from the rear which, according to Fowler, had looked over the one in front 150 to 200 feet away with both tows about the same distance from the right bank, in a stream 300 feet wide, with no other vessels around, in attempting to

pass would have continued its course after it had looked the tow in front over with a spotlight and given a signal of intention to pass. It is more likely that Fowler had insufficient lights, improperly placed, and did not give any signal of danger until the accident happened. When the plaintiffs proved incompetent and insufficiently experienced employees, operating without familiarity with any of the rules and regulations, having no license as pilots or navigators, the conclusion must be that the loss was due, at least in part if not wholly to defendants' negligence.

■ The measure of damages for goods lost in transit is the market value thereof at the destination at the time they should have been delivered, less freight charges. Anderson, Clayton & Co. v. Yazoo & M. V. R. Co., 174 La. 762, 141 So. 453; Bancroft v. Yazoo & M. V. R. Co., 194 La. 115, 193 So. 481; Gore Products v. Texas & N. O. R. ·Co., La. App., 34 So.2d 418. See also V. Rivera S. En C. v. Texas & N. O. R. Co., 211 La. 969, 31 So.2d 180, 172 A.L.R. 791. In applying this rule to the present controversy, the court faces an almost impossible task because the testimony as to quality and value is absolutely irreconcilable. There is no doubt that plaintiffs sustained some loss from the sinking of the barge; but there can be no rational compromise between plaintiffs' claim that they lost 65 to 70 tons at $67.50 per ton and defendants' contention that the loss was 9 or 10 tons at $25 per ton.

Plaintiffs have attempted to estimate in detail the exact quantity, type, quality and value of the materials lost. They stated that there were 100 to 110 tons in the Shell landing and that only 35 tons were delivered. They claim to have sold some delivered pipe for $67.50 per ton. But the court cannot accept their estimate as proof or even as preponderating evidence. Neither is it satisfactorily proved that the pipe sold was that delivered on the steel barge; and even if that crucial issue were assumed, the testimony shows that considerable work had been done on the pipe to make it fit for resale at that price.

■ The court cannot accept defendants' evidence of market value at Lake Charles for the reason that it is not sufficiently related to the exact metal lost, and because it fails to take into consideration the price paid by plaintiffs. In addition, even if the court assumed that defendants had proved market value to be $25, there is no reasonable solution to the problem of quantity by tonnage. The court is impressed with the testimony of Mr. Todd, the Shell employee charged with the responsibility of selling the scrap, as being the most disinterested and logical. He estimated the total amount as not in excess of 30 tons, but cross-examination developed that the inspection he made was of such a nature that he could have underestimated the total weight very easily. This is not to say that it is likely he could have erred to the extent of 80 tons as compared to plaintiffs' estimate of 110 tons or overestimated by 12 tons as compared to defendants' estimate of 18 tons. Even on the basis of the most reasonable testimony in the case, the court simply cannot fix the quantity with any assurance of accuracy. Hence, the court is required to determine the market value and the amount lost on the basis of other testimony, taking the material as a whole without reference to tonnage or value per ton.

Todd testified that he would not ordinarily sell such scrap at a ridiculously low price, but he said that at the time his company was particularly anxious to clean up the landing; and it is reasonable to believe that he would sell at a lower than ordinary price under such circumstances. The whole of the material was sold for $185, conditioned upon the purchaser's cleaning up the Shell landing. His estimate of the cost of cleaning up the area was $400, making the total consideration received by Shell $585.

Plaintiffs and their witness Reed, who bought the material from Shell, testified he sold it to plaintiffs for $1,500. While

there is some question in the court's mind as to the exact arrangement between Reed and plaintiffs, there is nothing in the record contradicting their testimony on this point. When it is considered that Shell received nearly $600 for the scrap under circumstances suggesting a somewhat forced sale, it is not unreasonable to say that the entire lot had a value to a willing buyer of $1,500 at the Shell landing.

It is self-evident that the material would have a greater value to a willing buyer at Lake Charles, where it was to be reconditioned as much as possible and sold at retail, than at the Shell landing. It was obviously worth the amount paid plus the $375 transportation cost. Adding this additional value of $500 at Lake Charles to the price paid of $1,500 gives a value to the whole of $2,000.

As stated, it is impossible to determine from the evidence the exact amount lost. Plaintiffs and their witnesses testified that only about one-third of the total and poorest material was delivered, while defendants' witnesses swore with equal assurance that the greater portion and best of the scrap was aboard the steel barge.

Since there is such a complete conflict of testimony on these points, the court must look to other sources to clear up as much as possible this confusion. Although the witness Fowler, who had charge of defendants' tug and the tow, was not impressive as a seaman, his was the only positive testimony as to the safe capacities of the two barges. He stated the steel barge could safely carry as much as 18 tons and that the wooden barge which sank had a capacity of 24 or 25 tons. On this basis if each were fully loaded, the latter would have had aboard some 60% of the total. This tends to support plaintiffs' contention that about one-third of the total material was delivered. One of the plaintiffs, Jake Goltzman, was present during the loading of both barges, and also testified that the greater quantity of the material was put aboard the wooden barge.

Fowler and Voge, the latter operator of defendants' derrick barge, as witnesses for the defendant, admitted that during the loading the wooden barge dipped under the water line and one corner became stuck on the bank of the landing. After some difficulty it was dislodged and moved to another pile of scrap which was also put aboard. This tends to support the contention that the wooden barge must have started its journey with considerably more than 10 tons and probably near capacity. On the whole therefore, the evidence supports the conclusion that 60% of the total material was lost with the wooden barge.

The witness Todd testified that the material was a mixture of many kinds of "junk" and the evidence otherwise is in utter conflict as to its quality. The conclusion therefore is that the quality was substantially the same on both barges. On this basis the plaintiffs' damage was 60% of the market value of the entire lot ($2,000), or $1,200.

The court also finds that defendants failed to establish with any reasonable certainty that the delay in loading the barges was attributable to plaintiffs.

There should be judgment for the plaintiffs and against the defendants in the sum of $1,200, less the transportation charges of $375, or the sum of $875, with interest at the rate of five per cent. per annum from date of judicial demand until paid and all costs.