**SHAPIRO v. PENNSYLVANIA R. CO.**

No. 6563.

United States Court of Appeals for the District of Columbia.

Argued Feb. 10, 1936.

Decided March 23, 1936.

Jacob C. Levy and Henry J. Balzer, both of Washington, D. C., for appellant.

R. A. Bogley, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, GRONER, and STEPHENS, Associate Justices.

GRONER, Associate Justice.

Appellant, Shapiro, sued the Pennsylvania Railroad Company, as delivering carrier, to recover damages for failure to safely refrigerate and transport a carload of peas and cauliflower from Auburn, Washington state, to Washington, D. C. At the close of all the evidence the trial court directed a verdict for the railroad.

Appellant is a produce commission merchant in Washington City. At the time in question his custom was to purchase fresh vegetables in the West through an agent in Auburn. The agent would inspect the produce, advise appellant of its condition and the market, and arrange for shipment to Washington City. On July 27, 1931, the agent obtained an option for the purchase of a mixed car of peas and cauli-

flower, and telegraphed appellant: "This bargain below market but this packer forced sell; needs the ready money." Two days later (29th) the agent informed Shapiro that the produce had been loaded for shipment via Chicago, Milwaukee, St. Paul & Pacific and Pennsylvania Railroads. The car arrived in Washington City August 8, 1931, and on inspection the peas and cauliflower showed sufficient rot and deterioration to render them unmerchantable in the usual channels. Appellant commenced unloading on Monday, August 10th, and released the car August 15th.

At the trial appellant produced the bill of lading dated July 29, 1931, signed by Sound Produce Shippers, Inc., as shipper. On it was a notation—this bill of lading issued in exchange for bill of lading issued at Auburn, Washington, 7/28/31.[1] Appellant also introduced in evidence a slip indicating government inspection of the contents of the car as follows:

"Quality and Condition: Peas: Pods are generally fresh, tender, of reasonably uniform maturity, fairly well to well filled. Defects average 25%, consisting mostly overmature, remainder immature, scarred and broken pods. Cauliflower: Jackets are fresh, green, well trimmed; flowers generally white and compact. Defects average 25%, consisting of mostly rice heads, remainder fuzzy, discolored and worm injury. No decay.

"Grade: Peas: Approximately 75% of stock is of U. S. No. 1 quality. Cauliflower: Approximately 75% of stock is of U. S. No. 1 quality."

The railroad introduced evidence showing that the application for the car was received by its agent at Auburn at 9 p. m. July 27, 1931. The original was produced, and opposite the heading "Kind and Capacity" appeared the words "Dry Car." A pencil line had been drawn through these words and in their place appeared the words "S/R 2% salt at first Re Ice station, no further salt." The railroad agent at Auburn testified that the application for a dry car—a refrigerator car without ice—was received by him at 9 p. m. on July 27, 1931; that at 10 p. m. of the same night he had car URT 88483—uniced—placed for loading; that loading commenced at 11 p. m. that same night; that at 12:30 p. m. the next day, July 28th, an order was received from the shipper to change the order from "Dry

Car" to standard refrigeration; that he demanded a written order for the change, and received from the shipper an order dated 12:30 p. m., July 28, 1931, signed by the shipper, requesting standard refrigeration. This was introduced in evidence. The agent testified that icing of the car was then begun and was done under his inspection; that 8,900 pounds of ice was placed in the bunkers at 1:30 p. m. July 28th; that loading was completed at 5 p. m.; and that the car was forwarded at 11:50 p. m. of that day.

In addition to the bunker ice, the shipper placed 9,600 pounds of ice on top of the crates and hampers. This type of icing is referred to as "top icing."

The railroad proved by its records that the car was properly iced at all the different icing stations en route and was always in good mechanical condition.

On arrival in Washington, only about 100 pounds of top ice remained. The bunkers were nine-tenths full, and the temperature in the car 52 degrees at the top of the load. The peas and cauliflower showed from 1 per cent. to 7 per cent. soft rot.

Eight errors are assigned. We shall discuss them in their order.

■ Appellant's first assignment relates to the court's refusal to permit his witness, Ralph A. Koontz, to testify, as an expert, how much top ice should have been in the car upon arrival in Washington City. The evidence shows that Koontz represented appellant in his traffic and transportation work, and that he had had many years' experience in those lines. There was no evidence that he had ever had any experience in respect to refrigeration; and the question itself was not framed in such a way as to give him knowledge of the manner in which the shipment was loaded or iced at the point of origin. All that appears is that he was handed the bill of lading and asked to examine it and express his opinion as to the quantity of top ice which should have been in the car at destination. We think the ruling of the trial court in rejecting the evidence was correct. Even a nonexpert would know that the melting of the ice in transit would depend in large measure upon the weather or heat conditions existing at the time the ice was placed in the car. If the car had been pre-

---

[1] The 7/28/31 bill of lading showed shipment destined to Chicago.

cooled, it is manifest the ice would have melted more slowly; and as the witness had no personal knowledge of the facts, and the question did not disclose them, it is clear he could have had no safe opinion on the subject. See Hitchner Wall Paper Co. v. Pennsylvania R. R. Co. (C.C.) 158 F. 1011, affirmed (C.C.A.) 168 F. 602.

[2, 3] The second assignment is to the action of the court in allowing the railroad company to prove by its records the re-icing of the car between Auburn and Chicago. The particular record objected to was a printed form known as form 1916, on which the original icing service and the re-icing from time to time and place to place, as the car moved to its destination, were shown. The custom of the railroad was: that, as the car was inspected and re-iced, the persons who supervised the re-icing would supply the information on form 1920, which would be sent in to the Chicago office of the railroad and there transcribed onto form 1916 —which had been previously received from the agent at point of origin. The result would be that form 1916 would show the icing for the movement from point of origin to Chicago. This particular record was proved by the officer of the railroad who had charge of keeping the records, and we think it was amply shown that this was the original, permanent record of the railroad company. As such, it was admissible in evidence and within the recognized exception to the hearsay rule.

The rule now applied by federal and, so far as we know, by most of the state courts is that records of a railroad company made contemporaneously with the facts by the employees of the company in the regular course of the business of the company, as a part of a system habitually used, may be proved in court by the agent or clerk whose duty it is to make and keep the records and to preserve them for future use. E. I. Du Pont de Nemours & Co. v. Tomlinson (C.C.A.) 296 F. 634, 640, 641; St. Paul Fire & Marine Ins. Co. v. American Food Products Co. (C.C.A.) 21 F.(2d) 733.

We think the record was properly admitted.

██ The third assignment is to the action of the court in admitting the testimony of the defendant's witness, Gilbert Frenz. Frenz was foreman of Federal Ice & Refrigerating Company at Blue Island, Ill. That company's plant is located on the Belt Line, i. e., the transfer line from the Milwaukee line to the Pennsylvania line, and does all the icing of through refrigerator cars destined to points east. The witness identified a document as an icing statement covering the car in question. He stated that he had personally seen to the icing of that car, and that the figure "12" on the document opposite the car number was in his handwriting and indicated that he had supervised the placing of 1,200 pounds of ice in the bunkers of the car. The objection was that the exhibit was a carbon typewritten copy of the form made up by the Belt Line, and that the original should have been produced. The witness testified that the Belt Line made up the list of cars to be iced and his company did the icing and retained a copy of the record, and that the copy produced was his company's original and permanent record of ice supplied to the cars shown on the statement.

It is difficult to see any ground for rejecting this evidence. The witness was testifying from his own knowledge of an event in which he had himself participated, and the paper was a memorandum made by him at the time he performed the service and used by him to refresh his memory. It is elementary that the memory of a witness may be refreshed by calling his attention to a proper writing or memorandum. Putnam v. United States, 162 U.S. 687, 694, 16 S.Ct. 923, 40 L.Ed. 1118. The objection was properly overruled.

██ The fourth assignment is to the action of the court in permitting appellee's witness Hobbs to answer, as a refrigeration expert, a hypothetical question covering the facts proved in the case. The witness was told the circumstances of the loading, the icing, and re-icing, the temperatures at the various re-icing points, the condition of the shipment at point of origin as shown by government report, and its condition on arrival, and was asked what, in his opinion, was the cause of the deterioration. The objection to the question was that the record did not show the temperature at the exact time of the icing services, but only the maximum and minimum for that day. In this court a further objection is that the temperatures at two of the icing stations were not included, but that the temperatures at two near-by places were substituted. We regard these objections as too trivial to re-

quire notice. Nor, indeed, do we see any particular relevancy in the question of the temperatures at any of the various places after loading. The icing operation en route is done by opening the hatches on top of the car and completely filling the bunkers with ice. The car itself is not opened, and the railroad owed no duty to replenish the top icing. When it had completely filled the bunkers at origin and at re-icing stations, its contract of refrigeration was complied with.

Appellant's assignments Nos. 5, 6, 7, and 8 all relate to the ruling of the lower court that there was nothing to support a verdict in favor of the plaintiff. The court was of opinion that the evidence showed that the railroad company had fully discharged every duty owing by it to the plaintiff, and that the damage was caused by the perishable nature of the freight. This is also our conclusion, together with the negligence of the shipper in loading into a hot car. The rule of liability applicable to freight shipments is well stated in Northwestern M. & T. Co. v. Williams, 128 Minn. 514, 151 N.W. 419, 420, L.R.A.1915D, 1077, as follows: "A common carrier of goods in general insures the safe transportation of goods committed to him for that purpose, and he is responsible for all damage to the same while in transit, unless such damage is occasioned by certain excepted causes. These excepted causes are act of God, act of public enemy, the inherent quality or 'proper vice' of the articles themselves, or some act or omission of the shipper or owner."

Or as recently stated by Mr. Justice Stone in Schnell v. The Vallescura, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373: "He is a bailee intrusted with the shipper's goods, with respect to the care and safe delivery of which the law imposes upon him an extraordinary duty. Discharge of the duty is peculiarly within his control. All the facts and circumstances upon which he may rely to relieve him of that duty are peculiarly within his knowledge and usually unknown to the shipper. In consequence, the law casts upon him the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability."

Here the railroad has explained the damage and brought itself well within the excepted cases. The evidence shows that appellant's agent, after the purchase of the produce, first intended to ship it to Chicago. Such a movement ordinarily requires no bunker refrigeration; top icing being sufficient. This accounts for the original order to the railroad to furnish a dry car; and, while it is true that appellant's agent and one Kitamoto, an employee of the shipper, testified that a pre-iced car was ordered, the documentary proof establishes that this was not true in the first instance, but only after a dry car had been ordered, furnished, and partially loaded. Besides this, both were present when the car was delivered at night on the 27th and throughout the loading. They saw to the loading and to the placing of the top ice; and the conclusion is inescapable that it was not until the following day that the original order was canceled and the change from dry to refrigeration car made. This was the same day on which appellant was notified by his agent in Auburn of the purchase of the car for his account; and it is manifest that it was then, for the first time, that the destination of the car was changed and refrigeration substituted for the usual dry car intended for Chicago delivery.

Laying aside, therefore, the charge made by the railroad that the shipper delivered produce 25 per cent. defective and considering only the voluntary act of the shipper in placing the produce in a hot car, it is apparent from all the evidence that, whatever the condition of the shipment at the time of loading, the circumstances of the loading in the respects mentioned and the transportation thereafter for more than 2,000 miles would almost certainly result in damage from rot; for both sides agree that the universal custom, in the handling of perishables like peas and cauliflower, is to have cars pre-iced before loading. Pre-icing requires from 12 to 20 hours, and the reason it was not done prior to delivery was because, as we have pointed out, the shipper intended delivery to be made in Chicago.

No question is made of the prompt movement of the car from origin to destination nor that the bunkers were 90 per cent. full on arrival.

In the circumstances, it is manifest that the damage sued for occurred as the result of the inherent vice of the things shipped; and, in that view, it is equally

manifest that the railroad is not an insurer and is not liable.

A recent case illustrative of the principle we apply is Cassone v. New York, etc., R. Co., 100 Conn. 262, 123 A. 280, 283. There the plaintiff sued for damages to grapes shipped from the West Coast to Connecticut. The bill of lading showed that the shipper ordered a dry car, but stipulated for ventilation. The court found that the defendant discharged its duty as to this service, and said: "The consignor took advantage of the choice, which was his, and contracted for transportation in a dry car without ice, relying upon ventilation to protect the fruit. A shipper cannot make that choice and then insist that the carrier must assume the peril of any loss that comes to the fruit in transit in the way contracted for, if it develops, on delivery of the grapes, that ventilation failed to keep the grapes from decay when refrigeration might have done so."

To the same effect is Chesapeake & O. R. Co. v. Thompson Co., 270 U.S. 416, 46 S.Ct. 318, 70 L.Ed. 659.

We must therefore affirm the judgment of the lower court.

Affirmed.