## STANDARD HOTEL SUPPLY CO., Inc., v. PENNSYLVANIA R. CO.

District Court, S. D. New York.

Nov. 26, 1945.

Isseks & Reyman, of New York City (Samuel S. Isseks and George R. Raducan, both of New York City, of counsel), for plaintiff.

Bleakley, Platt & Walker, of New York City (Dennis P. Donovan and Roswell P. C. May, both of New York City, of counsel), for defendant.

LEIBELL, District Judge.

This action is brought by plaintiff to recover damages sustained by it, through the alleged negligence of the defendant railroad in failing to provide and maintain a properly iced refrigerator car for a shipment of meats and provisions. Plaintiff is engaged in the business of supplying hotels, restaurants and clubs with meats and provisions. It buys meats, provisions and poultry in large quantities, and stores them either in a freezer or in a cooler, on its premises at No. 352 West 26th Street, New York City, until needed to fill customers' orders.

Prior to June 1942 certain orders had been received by plaintiff from customers in San Juan, Puerto Rico, for meats, fresh and processed. Enemy action off the Atlantic coast during the spring of 1942 was a menace to shipping. Shipping space to Puerto Rico was not available out of the port of New York. On June 15, 1942, the Bull Steamship Line notified plaintiff that it would have shipping space available for plaintiff on one of its vessels scheduled to sail from Pensacola, Florida, on the 25th or 26th of June, and that if a shipment was sent by rail from New York City on the 19th of June it would arrive at Pensacola in time to be put aboard ship.

Plaintiff's secretary and office manager, Rose Eckhaus, proceeded to make shipping arrangements. On June 15th she telephoned the defendant railroad and stated that she wished to reserve a refrigerator car for a shipment of meat to Pensacola to leave on June 19th. She was informed that it would be necessary for her to obtain a permit from the Association of American Railroads. She obtained the necessary forms from the Association. On the morning of June 18th she received a copy of the contents of the shipment from one of plaintiff's employees and she then filled out the forms, answering thereon the necessary questions, and she forwarded the forms to the Association by messenger.

The following quotation from plaintiff's brief indicates the source from which plaintiff obtained the quantities of meat for this shipment:

"An analysis of Plaintiff's Exhibit 8A reveals that approximately 9,449 pounds of meat were on hand at the plaintiff's freezer or cooler on June 15, 1942; that approximately 10,233 pounds were purchased and delivered to the plaintiff on June 15, 1942, and that the balance, or approximately 13,849 pounds were delivered to the plaintiff on June 18, or were picked up from other freezers and inspected on June 19, 1942."

The shipping permit was issued on June 18, 1945, and it was received by Summers, the defendant's carload receiving clerk at the West 37th Street freight station, June 19th. He testified that the Railroad keeps refrigerator cars on hand, but that they are not pre-iced unless the railroad receives instructions from a shipper to that effect. One shipper does its own icing, and others order different quantities of ice and percentages of salt. Mr. Summers received the first icing order from Miss Eckhaus at nine A.M. on June 19th, 1942. At 9:20 he phoned the Fruit Growers Express, which supervises refrigerator car icings for the defendant, and informed them that he wanted the car, which was assigned to plaintiff, iced to capacity with 10% salt. Later, after he had given the order to Fruit Growers, he received a call from Miss Eckhaus in which the icing was again discussed and as a result the order was changed by her to 20% salt. This change in salt percentage of the order was communicated to the men who came to the yard to ice the car, on their arrival.

The plaintiff contends that instructions to pre-ice the car were given by Miss Eckhaus on June 18th, and she so testified when recalled as a witness by plaintiff. However, she also testified on cross examination that she telephoned the railroad some time before the lunch hour on June 19th and said that the bill of lading had been completed and that it contained the instructions "Ice car with crushed ice to capacity and re-ice at all icing stations" and that she had also included 10% salt. She asked if that was sufficient and she was informed that owing to the warm climate in the South it was advisable to increase the salt to 20%. She requested that this be done, and she thereupon changed in ink to 20% the 10% which she had typed on the bill of lading. In icing a refrigerator car, the salt mixture in the designated percentage is spread over the layers of ice, in the course of the icing. The

salt is not deposited in bulk after the bumper is filled with ice.

■ The records kept by the Fruit Growers Express show that the icing of the car was commenced at 11:25 A.M. and completed at 11:42 A.M., on June 19th, 1942. The shipper's employees, according to their own testimony, started to load the car a few minutes later, about 11:45 or 12 Noon, and at 12:30 they closed the doors and went to lunch. They resumed loading after lunch and completed the task at about 4:30 P. M. June 19, 1942. If plaintiff's employees had had any experience in loading a carload of meat and provisions into a refrigerator car, they would have known when they stepped into the car to load it that the car had not been iced very long. This was the first carload they had ever loaded. Prior shipments had been less than a carload and were loaded by an express or forwarding company into one of its own cars. However, the experience of plaintiff's employees in working in and about the plaintiff's freezer and cooler should have warned them that the car was not cold enough to receive the shipment of meats. They should have known the extent to which the meats had been frozen and whether the car was sufficiently chilled to receive the frozen meats and maintain them in that condition. Plaintiff's employees did not inquire when the car was iced. They made no complaint about the condition of the car and went right ahead with the loading. The railroad did not assume the responsibility of knowing the condition of the meats, the degree of temperature they required, or how much pre-icing the car should have. Experts testified that to receive a shipment of meat, the car should have been pre-cooled about twelve hours. Plaintiff did the loading and assumed full responsibility therefore under the terms of the bill of lading which bore the stamp "Shippers Load and Count."

The loaded car left 37th Street on a float at 6:15 P.M. on June 19th. At Jersey City it was coupled into a train bound for East St. Louis. From there it proceeded to Pensacola, arriving at 7:05 P. M. on June 26, 1942. On Saturday morning, June 27th, the Bull Line was notified of the arrival of the car. On the 29th the car was ordered to the dock of the Bull Line, was opened and the contents of the shipment inspected. On June 29th the plaintiff received word from the Bull Steamship Line that the shipment was received at Pensacola, Florida, in bad condition and that it had been rejected.

There was a second inspection at plaintiff's request but the rejection order was not changed. On July 3rd the car was shipped back by rail to Jersey City, at plaintiff's direction. On arrival on July 10th the fresh meats were found to be completely spoiled. Most of the processed and canned meats were salvaged.

The railroad's records show that the car had been regularly re-iced to capacity with a 20% salt, as directed by plaintiff, on its journey from New York to Pensacola. The trip was without any unusual incident. The damaged condition of the shipment was not due to any fault of the Railroad. The only plausible explanation for the damage is that the car was not sufficiently pre-cooled on June 19th to receive the shipment of meat and maintain it at a proper temperature. The car should have been iced twelve hours in advance of loading. The car had come north from Alabama with a shipment of potatoes. It had been iced initially at Loxley, Alabama, with 8,000 pounds of ice on June 13th and had not thereafter been re-iced. It arrived in New York on June 18th at 5:30 A.M., having travelled from Atlanta, Georgia, with its vents open. The ice bunkers were empty when it was iced for plaintiff at 11:25 A.M. on June 19th. Because plaintiff failed to order the icing sufficiently in advance of the loading, plaintiff's instructions were "incomplete, inadequate or ill conceived." Tariff Rule 135. The plaintiff either did not know just what pre-cooling the car required, or was so pressed for time that it could not wait and assumed a risk that had unfortunate consequences.

■ The shipment of goods by rail interstate is subject to the provisions of the Interstate Commerce Act, and under Section 20 thereof, 49 U.S.C.A. § 20, the railroad is liable for any loss, damage or injury to such property caused by the Railroad. Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314, 44 L.R.A.,N.S., 257; Peyton v. Railway Express Agency, 316 U.S. 350, 351, 62 S.Ct. 1171, 86 L.Ed. 1525, rehearing denied 317 U.S. 705, 63 S.Ct. 23, 87 L.Ed. 563; 318 U. S. 798, 63 S.Ct. 527, 87 L.Ed. 1162; Id., 318 U.S. 799, 63 S.Ct. 658, 87 L.Ed. 1162; Id., 318 U.S. 802, 63 S.Ct. 979, 87 L.Ed. 1164; 319 U.S. 779, 63 S.Ct. 1024, 87 L.Ed. 1724; Illinois Steel Co. v. Baltimore & O. R. Co., 320 U.S. 508, 510, 511, 64 S.Ct. 322, 88 L. Ed. 259. Under the Act the responsibility assumed by the carrier is fixed by the agree-

ment made and contained in the bill of lading, in accordance with published tariffs and regulations. Southern R. v. Prescott, 240 U.S. 632, 637, 638, 36 S.Ct. 469, 60 L.Ed. 836; Chesapeake & Ohio R. v. Martin, 283 U.S. 209, 221, 51 S.Ct. 453, 75 L.Ed. 983; Georgia, Florida & Alabama R. v. Blish Co., 241 U.S. 190, 197, 36 S.Ct. 541, 60 L.Ed. 948.

Rule 130 of Perishable Protective Tariff No. 11, Section No. 1, of the General Rules and Regulations provides:

"Condition of Perishable Goods Not Guaranteed by Carriers

"Carriers furnishing protective service as provided herein do not undertake to overcome the inherent tendency of perishable goods to deteriorate or decay, but merely to retard such deterioration or decay insofar as may be accomplished by reasonable protective service of the kind and extent requested by the shipper, performed without negligence."

Rule No. 135 of said Perishable Protective Tariff provides:

"Liability of Carriers—Property accepted for shipment under the terms and conditions of this tariff will be received and transported subject to such directions, only, and to such election by the shipper respecting the character and incidents of the protective service as are provided for herein. The duty of the carriers is to furnish without negligence reasonable protective service of the kind and extent so directed or elected by the shipper and carriers are not liable for any loss or damage that may occur because of the acts of the shipper or because the directions of the shipper were incomplete, inadequate or ill-conceived."

Rule 35 of said Perishable Protective Tariff provides:

"Ordering Cars

"(A) Orders for cars must be filed with reasonable advance notice by shippers with the originating carriers agent and must be given in writing (or if given orally or by telephone must be confirmed in writing by the shipper within seventy-two hours) and must specify the type of car (refrigerator, ventilator, box, etc.) commodity to be loaded, and character of, character of carriers service desired. * * *."

■■■ The icing orders given by the plaintiff shipper to the defendant railroad were not reasonably in advance, under Tariff Rule 35, when they were given on the morning of June 19th, the morning on which the car was loaded by the shipper with perishable meats. Pre-iced cars are not kept on hand. The initial icing must be specifically ordered by the shipper. If plaintiff wished a car pre-cooled for a certain length of time, plaintiff should have so indicated and should have given the initial icing order to defendant sufficiently in advance of loading, or else plaintiff should have waited a proper time before starting to load. The defendant railroad furnished reasonable protective service, of the kind and extent requested and directed by the plaintiff shipper under Tariff Rules 130 and 135; the loss was caused by the acts of the shipper, for which the railroad is not responsible. Shapiro v. Pennsylvania R. Co., 65 App. D.C. 324, 83 F.2d 581; South Carolina Asparagus Growers Association v. Southern R., 4 Cir., 46 F.2d 452; Leonard v. Pennsylvania R. Co., D.C., 15 F.Supp. 55, 56.

■■■ As indicated above the frozen meat was loaded by the shipper into a comparatively warm car. The loading was done by the shipper under a "shippers load and count" bill of lading, which "placed upon the shipper the obligation of seeing that the car was properly loaded." South Carolina Asparagus Growers Association v. Southern R., 4 Cir., 46 F.2d 452, 454. The carrier is not liable for damages caused by improper loading under this type of bill of lading. See § 21 of Federal Bills of Lading Act, Title 49 U.S.C.A. § 101. The railroad is not required to have experts at loading points to advise shippers concerning the proper car temperature at which to load the many different kinds of perishable commodities. Each shipper is supposed to know the condition of his own commodity and the requisite amount and period of pre-icing, if any, that the commodity requires. There is no duty imposed upon the railroad to warn the shipper that he should wait a certain length of time after the car is iced, before loading his perishable goods into the refrigerator car. Indeed, it has been held that "mere knowledge on the part of the local agent of the carrier of the negligent manner in which the shipment had been packed could not impose liability for this negligence on the carrier, where the shipper itself had expressly undertaken the packing and the injury sustained was due to negligence in this regard and not to any negligence on the part of the carrier." South Carolina Asparagus Growers Association v. Southern R., supra.

■■■ The plaintiff offered evidence that there is a custom in New York to the effect that when a shipper requests the railroad

to have a refrigerator car ready for the shipper, the carrier's agent usually questions the shipper as to the amount of ice and the percentage of salt needed. From this plaintiff argues that it is likely that the subject of icing was discussed June 18th when Miss Eckhaus called Summers to say that she had obtained a permit and would want a refrigerator car the next morning. Opposed to this are defendant's records which show that the order for icing with 10% salt, was received from plaintiff early on the morning of June 19th. Plaintiff later changed the order by increasing the salt to 20%. Evidence of custom is not admissible to vary the terms of filed tariffs. American Railway Express Co. v. American Trust Co., 7 Cir., 47 F.2d 16, certiorari denied 284 U.S. 629, 52 S.Ct. 13, 76 L.Ed. 536. The filed tariffs are binding on both the shipper and carrier and may not be waived or varied. Georgia Florida & Alabama R. Co. v. Blish Co., supra; Southern R. v. Prescott, supra; Davis v. Henderson, 266 U.S. 92, 93, 45 S.Ct. 24, 69 L.Ed. 182; Chicago & Alton R. v. Kirby, 225 U.S. 155, 166, 32 S.Ct. 648, 56 L.Ed. 1033, Ann.Cas.1914A, 501; Louisville v. Nashville R. Co. v. Chatters, 279 U.S. 320, 331, 49 S.Ct. 329, 73 L.Ed. 711. Under Rule 130 the carrier is required to furnish only the reasonable protective service of the kind and extent requested by the shipper, and not any additional service allegedly based upon a custom prevailing at the place of shipment.

I have filed findings of fact and conclusions of law, together with this opinion. Judgment has been directed in favor of defendant, dismissing the complaint on the merits, with costs and legal disbursements.