*44 So.2d 101*

**RED RIVER COTTON OIL CO. et al. v.
TEXAS & P. RY. CO.**

No. 39205.

Dec. 9, 1949.

Rehearing Denied Jan. 9, 1950.

Peterman & Burden, Alexandria, for defendant and appellant.

Stafford & Pitts, Alexandria, for plaintiffs-appellees.

FRUGE, Justice.

Defendant, the Texas and Pacific Railway Company, is appealing from a judgment in favor of the Red River Cotton Oil Company and its four insurers in the aggregate amount of $31,573.08, representing the value of four freight-car loads of copra destroyed in a fire at the oil company's mill.

The undisputed facts of the case are that the copra was part of a consignment shipped from the Philippine Islands to New Orleans by steamship and from New Orleans to Alexandria, Louisiana, on the de-

fendant railroad. When the cars arrived in Alexandria, on Sunday, February 9, 1947, they were moved by defendant's switch engine onto the spur track which serves the plaintiff's mill. It appears that the spur track although owned by the railroad, was maintained for the exclusive use of the plaintiff under a spur track agreement. The track enters the wire fence enclosing the mill grounds through a double gate about 687 feet from the switch point. The gates are kept locked when the mill is not operating and the plaintiff keeps the key. On the day in question, following the customary procedure, the engineer halted the train at the gates and blew the whistle as a signal for the oil mill employees to open them. The gates were opened and, at the direction of the oil mill employees, the cars were pushed into the oil mill enclosure, weighed one by one on the oil mill scales, and spotted on the track at the place designated by the oil mill employees. The switch engine was backed out and the gates were closed and presumably locked.

The oil mill was shut down on Sunday until 6 p.m. and the copra was not unloaded. At about 3:30 a.m. on Monday a fire broke out in the oil mill adjacent to the cars and four of the cars with their cargo were destroyed. There is some dispute as to the cause of the fire but we agree with the trial judge that it remains unknown. It is agreed that the free time for unloading had not elapsed.

The copra was shipped from New Orleans to Alexandria under bills of lading which, together with the applicable tariffs and classifications lawfully on file with the Interstate Commerce Commission, constitute the contract between the parties. V. Rivera S. En C. v. Texas & N. O. R. et al., 211 La. 969, 31 So.2d 180.

The common law development of the carrier's liability as an insurer has been presented recently in detail by this court in the opinion by Chief Justice Fournet (then senior associate justice) in the Rivera case, supra. Undoubtedly, if that liability still attaches, the defendant is answerable for the loss. We have here the problem of determining whether, under the bills of lading, that liability was still in full force and effect when the loss occurred, or whether, by the delivery of the cars into the custody of the plaintiff, the liability had ceased. The question is one of the intent of the parties as expressed in the bills of lading.

The pertinent parts of the bills of lading are quoted as follows:

"Contract Terms and Conditions

"Sec. 1, (a) The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided.

"(b) * * * The carrier's liability shall be that of warehouseman, only, for loss, damage, or delay caused by fire occur-

ring after the expiration of the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided) after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination, or tender of delivery of the property to the party entitled to receive it, has been made * * *.

"Sec. 4, (a) Property not removed by the party entitled to receive it within the free time allowed by tariffs, lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, * * *."

We are of the opinion that this case is controlled by the case of Michigan Central Railroad Company v. Mark Owen and Company, 256 U.S. 427, 41 S.Ct. 554, 65 L.Ed. 1032, in which the Supreme Court of the United States held that the carrier liable for the loss of goods under similar circumstances when shipped under a similar bill of lading.

In that case the car in question had been placed on a public siding or team track. The consignee had broken the railroad com-

pany's seals, inspected the cargo, found it to be intact and begun unloading it. Before the cargo was completely unloaded, part of it was stolen. The bill of lading for the shipment provided in Section 1, "The carrier or party in possession of any of the property herein described shall be liable for any loss thereof or damage thereto, except as hereinafter provided."

In Section 5 it was provided:

"Property not removed by the party entitled to receive it, within forty-eight hours exclusive of legal holidays, after notice of its arrival has been duly sent or given, may be kept in car, depot, or place of delivery of the carrier subject to a reasonable charge for storage and to carrier's responsibility as warehouseman only * * *."

Counsel for the railroad contended that the provision thus quoted was not to apply in cases where there had been a delivery of the car to the consignee and the consignee had assumed complete control of it, and that its liability had ceased. In disposing of this contention the court stated:

"The bill of lading is definite, as we have pointed out, in its provisions and of the time at which responsibility of the company shall be that of warehouseman, and by necessary implication, therefore, until that responsibility attaches, that of carrier exists." [256 U.S. 427, 41 S.Ct. 556]

Defendant in the instant case has attempted to distinguish the Michigan case from the case at bar by pointing out that in the

instant case the cars had been placed on a private spur track within the locked enclosure of the consignee's premises.

■ Although the Supreme Court did say in the opinion that the shipment had not been delivered, we do not believe that this statement formed the point upon which the decision turned. As we interpret the decision it rests upon the proposition that the bill of lading indicated an intention on the part of the parties thereto to fix the liability of the carrier as that of an insurer until the operation of Section 5 of the bill should convert it to that of warehouseman.

A similar intent is indicated by the terms of the instant bill of lading quoted above, especially when considered with the report of the hearing before the Interstate Commerce Commission at which the present bill of lading was originally adopted and prescribed for all carriers within the commission's jurisdiction. See In the matter of Bills of Lading, 52 I.C.C.R. 671 (1919). The report reveals that the commission's action was taken after a hearing in which the major carrying, as well as the major shipping, interests of the country were represented, the purpose of all concerned being to establish a uniform bill of lading which would be fair and acceptable to both the shipping and carrying interests.

Prior to the hearing the shippers and carriers had met in committee and agreed upon most of the terms of the bill. At the hearing the arguments were presented pro and contra the disputed clauses. We have

studied that report in an effort to determine the intent of the parties to that hearing in submitting, supporting or opposing the various clauses which were in contest and to determine the purpose of the commission in adopting the provisions which it adopted and which make up the standard form of the bill of lading which is the immediate predecessor to the bills presently under consideration.

The first clause in the bill of lading adopted by the commission was agreed upon by both shippers and carriers as follows:

"Sec. 1. The carrier or party in possession of any of the property herein described shall be liable for any loss thereof or damage thereto except as hereinafter provided. * * *"

■ In effect it prescribes a general and absolute liability for loss, which, of course, will remain in force as long as the contract is in force, with the exceptions thereafter provided. This was in keeping with the carrier's common law liability as an insurer, first laid down by Lord Holt in the case of Coggs v. Bernard, 1 Smith's Leading Cases 369. The next clause with which we are concerned deals with one of the exceptions to the general liability, namely, the change from the general and absolute liability prescribed in the first clause to that of a warehouseman, which change would occur at the expiration of the free time after notice of arrival and placement for delivery.

The terms are exactly the same as those used in the bills of lading in the instant case. From examination of the report of the hearing we conclude that it was well understood by everyone concerned that this clause, *which was submitted by the carrier* in substantially the same form as adopted, was to have the effect of removing the uncertain and nebulous aspect of the law as to the point at which the carrier's liability as an insurer ended. In the first place, as the commission pointed out in yielding to the carrier's insistence that this clause be adopted, there were three rules which prevailed in various jurisdictions in the United States as to the time when the carrier's liability terminated. Moreover, termination of liability was in many instances dependent on the uncertain concept of "a reasonable time" from notice and placement for delivery. We think the carriers were deliberately sacrificing their defense of "delivery", which so often was determined against them, in an effort to fix a definite time limit to their liability. We cannot agree with defendant's position that this clause was to apply if, and only if, the car and cargo remained in the possession of the carrier during the time prescribed.

Our view is supported by the proposal of the carriers, adopted by the commission with unimportant modifications and appearing as adopted in Section 4(a) of the instant bills of lading, to the effect that the consignee could leave the cargo in the cars in which it was shipped after the expiration of the free time, "subject to the tariff charge for storage and to carrier's responsibility as warehouseman only." It is not suggested by the defendant, that the railroads did not intend to charge demurrage fees if the cars were under the control of the consignee at the expiration of the free time. This clause would certainly apply regardless of custody and control and the liability as warehouseman would certainly attach. We think that if, as is obviously the case, it is intended that the contract should remain in effect until the demurrage charges become operative, then the general liability prescribed in the first clause of the contract must remain in effect unless lifted by some specific provisions of the contract. This view is further borne out by the carriers' efforts to introduce a clause which would terminate their liability for shipments placed for delivery on private spur tracks, at the time when the cars were uncoupled. The commission refused to adopt that provision.

The Matter of Bills of Lading was again considered by the commission in 1921 and reported in 64 I.C.C.R. 357. We refer to this report for two reasons. In the first place, we find that our appreciation of the effect of the bill of lading adopted by the commission at the earlier hearing was shared by at least one group of carriers, for the commission notes at page 360 that the western carriers complained of "Extending carrier's liability as insurer during

'free time' and after 'placement' for delivery."

Our second reason for referring to this report is that we find there an explanation for the change which represents the only material difference between the bills of lading in the instant case and the one originally adopted by the commission in 1918 that is insofar as pertinent to the issues of this case. We refer to the insertion of the words "as at common law" in the general liability clause. (Compare the quotation of the clause in the instant bills with that of the bill originally adopted by the commission.) Defendant apparently regards this phrase as a reference to the common law to determine liability, not only as to its extent in the sense of coverage or the causes of loss which are included in the liability, but also as to the extent in the sense of duration or the time during which the liability attaches. We think the change was made in response to the objection of the western carriers to the "use of the first sentence of the current bill, requiring the carriers to contract that they will insure against everything not specifically exempted by the conditions." That is, after the insertion of the phrase "as at common law" if a loss was due to a *cause* which would not have rendered the carrier liable at common law, it would not be liable under the bill of lading, even though this was not specifically excepted therein. The provisions with respect to the *time* at which the liability ceased were not changed despite the carriers' protests.

Defendant has cited texts and cases in other jurisdictions to support its defense. The texts are inapplicable as they all refer to the liability at common law whereas here we are dealing with a contractual obligation. The same thing is true of Arthur v. St. Paul & D. Ry. Co., 38 Minn. 95, 35 N.W. 718; Black v. Ashley, 80 Mich. 90, 44 N.W. 1120; Whitney Manufacturing Co. v. Richmond & D. R. Co., 38 S.C. 365, 17 S.E. 147, 37 Am.St.Rep. 767; Rothchild Bros. v. Northern Pac. Ry. Co., 68 Wash. 527, 123 P. 1011, 40 L.R.A.,N.S., 773. So far as the records of those cases appear either there was no bill of lading or, if there was, it had no stipulation as to the duration of the carrier's liability as an insurer. The bill of lading in Vaughn v. New York, N. H. & H. R. Co., 27 R.I. 235, 61 A. 695, specifically excluded the loss by fire from the carrier's liability. In Ward v. Pere Marquette Ry. Co., 231 Mich. 323, 204 N.W. 120, the court was deciding whether there had been a conversion of the goods by the carrier's delivering them to the wrong party. It was admitted in Gus Datillo Fruit Co. v. Louisville & Nashville R. Co., 251 Ky. 566, 65 S.W.2d 683, that the carrier's liability as an insurer had ceased. It is possible that the other two cases cited by defendant, Southern Advance Bag & Paper Co. v. Terminal R. Ass'n, Mo.App., 171 S.W.2d 107 and Queen Ins. Co. v. Galveston, H. & S. A. Ry. Co., Tex. Civ.App., 290 S.W. 286, are contrary to our holding in the instant case. The terms of the bills of lading are not quoted but they

are referred to as standard bills of lading and the facts are similar to the case at bar. If this is true, we can only say that we do not feel free to ignore the plain language of the contract between the parties to this suit, in order to follow the cases cited.

■■ The defendant complains strongly of the court's ruling out certain testimony which was sought to be introduced in support of defendant's allegation that the fire started as a result of the faulty operation of the defendant's mill. The court refused to allow the defense attorney to question witnesses as to what they had been told by the mill laborers as to the origin of the fire. This was obviously hearsay and was properly excluded. The court also refused to allow the defendant to introduce a statement made and signed by the then secretary-treasurer of the oil mill. As we understand the statement thus excluded it could have amounted to no more than a guess by the witness as to the cause of the fire, and would not have been very persuasive. We do not think the defendant was prejudiced by the ruling.

■ The defendant has made a final plea as to the harshness of the law which directs an affirmance of the judgment. It is not a law but a contract and we must interpret it as it was written.

Defendant has not questioned here the amount of the damages.

Judgment affirmed; defendant is to bear the costs of this appeal.

HAMITER, J., dissents and will assign written reasons.

HAMITER, Justice (dissenting).

It cannot be gainsaid that the cars in question, together with their contents, were delivered to plaintiff prior to their destruction. At the time of the fire they were in the full custody and control of plaintiff, to the exclusion of every one else; they were neither actually nor constructively possessed by defendant. The custody and control was so complete in plaintiff, by virtue of the cars' being under lock and key managed by the latter, that the defendant could not have prevented the loss even had it received timely notice of the commencement of the blaze in the warehouse.

Unless there be contractual provisions to the contrary governing this case (the delivery having taken place), the defendant is not responsible. Generally speaking, the liablity of a common carrier as an insurer of the property entrusted to it for transportation " * * * endures from the shipment of the goods until their arrival at their destination, and continues thereafter until, *but only until*, the carrier has made an actual delivery of the property, in good condition, or has done that which may be considered an equivalent to, or a substitute for, such delivery." American Jurisprudence, verbo Carriers, Section 667.

The majority opinion holds the defendant responsible on the theory that the bills of lading (admittedly contracts between the

parties) render the carrier liable as an insurer when, as in this case, the fire occurs during the stipulated free time for unloading. But those bills of lading, I maintain, are inapplicable here. They, with reference to the contracted liability during free time, pre-suppose possession, custody and control of the goods by the carrier at the time of the loss; that which, as above shown, this defendant did not enjoy.

That the bills of lading contemplate only a loss occurring before delivery clearly appears from the provisions thereof quoted in the majority opinion. Thus, Section 1 (a) states: *"The carrier or party in possession * * * shall be liable * *."* In Section 1(b) we find: "* * * after placement of the property *for delivery at destination, or tender of delivery* of the property to the party entitled *to receive it,* has been made * * *." And in Section 4(a) it is said: "Property not removed by the party *entitled to receive it within the free time * * * after placement of the property for delivery* at destination has been made * * *." The emphasized language, obviously, would not have been used in the contracts if the liability of the carrier were intended to continue after the effecting of delivery. (Italics mine.)

The case of Michigan Central Railroad Company v. Mark Owen and Company, 256 U.S. 427, 41 S.Ct. 554, 556, 65 L.Ed. 1032, which the majority holds to be controlling of this litigation, is readily and easily distinguishable in that therein the

goods were stolen prior to their delivery. To quote from the opinion rendered in that case: "* * * The property here was not delivered; access was only given to it that it might be removed, and 48 hours were given for the purpose. Pending that time it was within the custody of the railroad company, the company having the same relation to it that the company acquired by its receipt and had during its transportation."

The cars containing the goods in the Michigan case, the opinion therein further shows, were located on a public delivery track of the railroad; hence, they were available to the carrier for inspection and even removal if and when it saw fit. The same cannot be said about the cars of copra in the instant case, which, at the time of their loss, were under lock and key and exclusively controlled by plaintiff.

I respectfully dissent.

On Application for Rehearing.

.PER CURIAM.

■ The defendant, Texas and Pacific Railway Company, strenuously urges on application for rehearing that under the facts in the instant case the railroad had made delivery of the shipment of copra before the fire occurred, and *that under the terms of the bill of lading all liability of the railroad had ceased.* After careful consideration of this contention of defendant, we are of the opinion that the rail-

road was in possession of the crops, and that a placement for delivery only had been made, for the reason that the copra was still in the cars of the railroad company. If no fire had occurred and the shipment had not been unloaded within the free time, there is no doubt that the consignee would have been liable for tariff charges for storage under the terms of the bill of lading. It is conclusive to us that under this bill of lading, as long as the copra remained in the cars of the railroad, the railroad was to be either a carrier or a warehouseman to the consignee, and, since the free time had not elapsed, it was a carrier under the provisions of the bill of lading. We adhere to our original opinion that the Michigan Central case is controlling here.

Rehearing denied.

HAMITER J. adheres to the reasons assigned in his dissenting opinion.