## CHESAPEAKE & OHIO RY. CO. v. GILBERT.

### No. 1091.

Municipal Court of Appeals for the District of Columbia.

Argued Aug. 13, 1951.

Decided Sept. 19, 1951.

John L. Hamilton, Washington, D. C., for appellant.

James B. Gilbert, pro se.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CAYTON, Chief Judge.

Involved on this appeal is the liability of a carrier for alleged improper protection of frozen meat entrusted to it for transportation. Plaintiff delivered to defendant 290 frozen veal sides for shipment from Washington, D. C. to Naval Supply Depot at Sewall's Point, Virginia. On arrival the shipment was rejected by Government officials on the ground that the meat was

5. Hariston v. Washington Housing Corp., D.C.Mun.App., 45 A.2d 287.

unsound. Plaintiff alleged that this condition was caused by insufficient refrigeration by defendant carrier, and brought his action for damages. The case was tried to a jury which awarded him $2,090.26, the amount stipulated to be the measure of his recovery. Defendant had moved for a directed verdict at the close of plaintiff's case and at the close of all the evidence. It also moved for a judgment non obstante veredicto and alternatively for a new trial. All these motions were overruled, and the defendant carrier brings the case here for review.

The important parts of plaintiff's evidence were these: The Government having accepted his bid for the meat in question, he had slaughtered, wrapped, and frozen the 290 veal sides for ultimate overseas shipment. It was first to be shipped to the Naval Operations Base at Sewall's Point, Virginia. Plaintiff discussed with defendant's agent the better procedure for shipping frozen veal sides and as a result of his conversation ordered a low-temperature car to be pre-iced the day before shipment to receive the load of veal on Friday, September 5, 1947. He said he was advised to ship it that day for delivery at Sewall's Point on Monday, September 8. He presented the testimony of two food inspectors of the U. S. Army that they had examined the veal when it was in a fresh state, that it was wrapped and transferred to a frozen storage locker immediately after slaughter and inspection, and that it was again examined by them before it was loaded on defendant's car. He offered in evidence the bill of lading which had been issued to him by the carrier, and in which he instructed the carrier to "Re-ice at all stations and at destination if delay in delivery." Thirty per cent salt was specified, the proportion recommended for maximum refrigeration. Plaintiff said, "I told them to ice at all stations and I told them on the bill of lading to ice at the destination if delay in delivery. I expected the car to arrive at Newport News prior to the time that it could be taken in at Norfolk, sometime over the weekend. I, therefore, ordered them to re-ice at destination, because I didn't want the car sitting there without

being re-iced." Plaintiff also testified that he himself procured a quantity of dry ice and had it hung in the car while it was being loaded to further assure a low temperature. The car arrived at Newport News, Virginia on Sunday, September 7, and was not shipped to the Naval Station until the following day (the Naval Station being closed on Saturdays and Sundays). Plaintiff, however, had nothing to do with the car from its loading until he was notified by the authorities at Sewall's Point on September 8 that the load was rejected because thirty-five per cent of the veal sides inspected were found to be "sticky," on the verge of thawing, and the degree of unsoundness ranged from slight to pronounced.

A Government inspector who had inspected the veal and recommended its rejection testified that after the inspection the temperature in the car was recorded at 47 degrees Fahrenheit.

After the rejection, plaintiff ordered the entire car re-iced and it was shipped back to him in Washington, where it was unloaded directly into a freezing locker. There the Army inspectors separated the soft sides from the hard frozen sides. Plaintiff prepared 76 new sides to replace those which had been set aside. He had another car prepared the same as the first and the load of original veal, including the replaced sides, was shipped and this time accepted by the Government.

■ We think plaintiff's evidence made out a prima facie case against the railroad. By proving that the meat was inspected and approved in a fresh state, hard frozen to an extent approved by the Government officials, and that the portion of the meat that remained hard frozen throughout the shipments back and forth was ultimately accepted by the Government, plaintiff established that the meat was in good condition when shipped. And it was even more clear that part of the meat was unsound upon arrival, and rejected by the Government for that reason. This was sufficient to put defendant to its proof. Delphi Frosted Foods Corp. v. Illinois Cent. R. Co., 6 Cir., 188 F.2d 343, affirming Delphi

Frosted Foods Corp. v. Illinois Cent. R. Co., D.C.W.D.Ky., 89 F.Supp. 55; Akerly v. Railway Express Agency, 96 N.H. 396, 77 A.2d 856; Sugar v. National Transit Corporation, 82 Ohio App. 439, 81 N.E.2d 609; 13 C.J.S., Carriers, § 254, page 546.

Defendant, however, contends that the evidence it offered rebutted any possible inference of negligence and that it established complete freedom of liability as a matter of law. Defendant relies on Protective Tariff Regulations promulgated under the authority of the Interstate Commerce Commission.

■ Concededly this action, involving interstate commerce, is governed by the applicable Federal statute and decisions. Likewise we must consider the bill of lading, applicable tariffs and classifications officially on file with the Interstate Commerce Commission, for all these taken together constitute the contract between these parties. Standard Hotel Supply Co. v. Pennsylvania R. Co., D.C.S.D.N.Y., 65 F. Supp. 439; Red River Cotton Oil Co. v. Texas & P. Ry. Co., 216 La. 519, 44 So.2d 101, certiorari denied 339 U.S. 953, 70 S.Ct. 841, 94 L.Ed. 1366; Texas & N. O. R. Co. v. Wolfson, Tex.Civ.App., 23 S.W.2d 455. Defendant offered in evidence certain rules on which it relied, and which we set out in full in the margin below.[1]

■ Defendant cites us to Atlantic Coast Line R. Co. v. Georgia Packing Co., 5 Cir., 164 F.2d 1, 3, rehearing denied 165 F.2d 169, wherein it was said, "It is apparent that these rules limit the liability of a car-

rier transporting perishable goods to liability for negligent failure reasonably to carry out instructions given by the shipper." In that case the court found as a matter of law that the carrier had carried out the instructions of the shipper and was consequently not liable for any deterioration of the product. In other words the court found that the shipper had failed to prove his charge of negligence. Undoubtedly, when that happens, a shipper is out of court. Also it is true that after a shipper has made out a prima facie case of negligence, the carrier may overcome it by evidence. Sutton v. Minneapolis & St. Louis Ry. Co., 222 Minn. 233, 23 N.W.2d 561; Southern Pac. Co. v. Itule, 51 Ariz. 25, 74 P.2d 38, and annotation 115 A.L.R. 1274; Standard Hotel Supply Company v. Pennsylvania R. Co., D.C.S.D.N.Y., 65 F. Supp. 439; Texas & N. O. R. Co v. Wolfson, Tex.Civ.App., 23 S.W.2d 455; Sugar v. National Transit Corporation, 82 Ohio App. 439, 81 N.E.2d 609; Delphi Frosted Foods Corp. v. Illinois Cent. R. Co., 6 Cir., 188 F.2d 343, affirming Delphi Frosted Foods Corp. v. Illinois Cent. R. Co., D. C.W.D.Ky., 89 F.Supp. 55.

Thus we come to the ultimate question on this appeal: Was the carrier's showing such as to entitle it to a favorable ruling as a matter of law, or was the trial judge correct in submitting the case for jury decision? The appellant carrier argues that the provision in the bill of lading, "Re-ice at all stations and at destination if delay in delivery 30% salt," was not in strict compliance with Rule No. 405, Supplement

1. "Rule No. 130: Condition of Perishable Goods Not Guaranteed By Carriers. Carriers furnishing protective service as provided herein do not undertake to overcome the inherent tendency of perishable goods to deteriorate or decay, but merely to retard such deterioration or decay insofar as may be accomplished by reasonable protective service, of the kind and extent requested by the shipper, performed without negligence."

"Rule No. 135: Liability of Carriers. Property accepted for shipment under the terms and conditions of this tariff will be received and transported subject to such directions, only, and to such election by the shipper respecting the

character and incidents of the protective service as are provided for herein. The duty of the carriers is to furnish without negligence reasonable protective service of the kind and extent so directed or elected by the shipper and carriers are not liable for any loss or damage that may occur because of the acts of the shipper or because the directions of the shipper were incomplete, inadequate, or ill-conceived." (From the National Perishable Freight Committee, Perishable Protective Tariff No. 14, J. J. Quinn, Agent, Interstate Commerce Commission No. 25, issued March 5, 1946.)

27, Protective Tariff No. 14. That tariff involves instructions the shipper must make in the shipping order and bill of lading. It provides that a similar notice must be endorsed by carrier's agent on the waybill. The basis of this argument seems to be that though there was a possible choice of some 20 instructions, plaintiff's instruction did not comply verbatim with any of those listed. Consequently, defendant says that instead of following the exact notation placed on the bill of lading, it was entitled to endorse the waybill, "Re-ice at all regular stations," and "That, when instructions are received on Bills of Lading 'Re-ice at all stations,' as a matter of practice, the railroad writes on the Way Bill the legend 'Re-ice at all regular stations.'" This, appellant claims, is pursuant to Section D of Rule No. 405, Supp. No. 27, which reads: "If shipper fails to specify in shipping order and/or bill of lading one of the instructions provided in paragraphs B or C, carriers will reice at all regular icing stations (if ice has previously been used), using salt if same has previously been used, and charges for such services will be as provided in this Section."

Appellant also offered in evidence Supp. No. 5 to Circular No. 5–H, issued by the National Perishable Freight Committee, which it says was accessible to plaintiff, to show that the only regular icing station between Washington, D. C. and Sewall's Point, Virginia was Potomac Yards, Virginia. (In that circular emergency icing stations were listed at Newport News, Virginia and Richmond, Virginia.)

Then defendant showed by introducing the records of its icing contractor at Potomac Yards that the car was iced there at 12:45 p. m. on September 6. Defendant also offered a witness who had examined the bunkers of the car containing plaintiff's shipment at Newport News and found them to be ¾ full of ice. Its refrigeration expert testified that a car whose bunkers were ¾ full of ice was adequately refrigerated for a delivery of the car the following morning. Defendant argues that this testimony is uncontroverted and fully complies with Rule No. 406 of the same Tariff No. 14, which reads: "(A) When ship-ment, except when billed—'Do not reice,' is held at any intermediate point between point of origin and final destination on orders of or awaiting reconsigning or other instructions from shipper, owner or consignee, or after arrival in the terminal train yard serving the destination and up to the time it is in process of unloading on team tracks or until placed on private track * * *, carrier will examine bunkers or tanks daily and unless written instructions (instructions given orally or by telephone must be confirmed in writing) from shipper, owner or consignee are received to the contrary when car requires additional ice or ice and salt during such period it will be reiced * * *."

We first examine Protective Tariff No. 14, Rule 405, Supplement 27, referred to above and which defendant says makes it mandatory that a shipper specify one of the twenty instructions, and that plaintiff had specified none of them. For example, under that rule, instruction (B) (9) reads: "Ice at (specify regular icing stations) with ..lbs. (crushed, course or chunk) ice, and oftener if delayed." It is true that none of the listed instructions were copied verbatim by the shipper, but carrier cites us to no decision holding that such exact copying is required. In this connection it is important to consider the following facts: Defendant offered in evidence Supplement No. 5 to Circular 5–H, published by the same Protective Tariff Committee. Though defendant says that this circular, setting forth the regular and emergency icing stations along the route, was available to plaintiff and he should have had knowledge thereof, defendant's own evidence showed that the circular was not on file with the Interstate Commerce Commission and there was nothing to show plaintiff had actual knowledge of its contents. Plaintiff denied all knowledge thereof. Here again the carrier cites us to no decision which would charge plaintiff with notice of the contents of such a circular or holding that despite such lack of knowledge he failed to comply with the tariff provisions demanding a specification of "regular icing stations" when in the bill of lading he specified "all" icing stations.

■ Even if we could assume that the carrier was justified in changing plaintiff's icing orders to read, "Reice at all regular icing stations and at destination if delay in delivery," we could not rule as a matter of law that the carrier reasonably and without negligence complied with even these terms. The evidence we recite as to the details of the icing in Potomac Yards does not compel such a finding. Defendant showed that the car arrived at Potomac Yards at 10:30 p. m. on September 5 and left at 9:30 p. m., September 6. While there it was necessary to make some repairs on the car which were completed by 6:20 p. m. on September 6. (The nature and extent of the repairs were not explained.) According to the records of the carrier's icing contractor, the car was re-iced at 12:45 p. m., September 6. Thus it appears that the car was allowed to remain for a period of over fourteen hours without icing service. Further, there is nothing to show that the car was inspected or found in satisfactory condition to withstand the waiting period. In the face of this evidence coming from defendant's own witnesses it would be wrong to rule as a matter of law that defendant gave the meat in the car a "reasonable protective service" and was free of negligence. This, it seems to us, was a typical jury question.

Regarding the instruction to re-ice at destination if delayed in delivery, defendant says that plaintiff himself was responsible for the lack of further refrigeration at Newport News, an emergency icing station, because of his failure to arrange for special icing of the car there. But as we said above, there is nothing to show plaintiff had actual notice of the nature of the station or was bound by the explanatory information in Supplement 5 to Circular 5–H, not on file with the Interstate Commerce Commission. Nor were there any other circumstances showing that the shipper should have known that special arrangements were necessary for icing at Newport News, since he had designated icing at "all stations." Aside from that, we think the evidence leaves a question as to defendant's due care in checking the car for ice at Newport News under provision 406 of the Protective Tariff heretofore mentioned. A witness offered by defendant as an expert testified (on cross-examination) that under the applicable tariffs the railroad was required to inspect the bunkers at Newport News, and to re-ice the car if necessary. Another of defendant's witnesses testified that they examined the bunkers of ice after its arrival about 3:50 a. m., September 7, at Newport News and found them ¾ full. Still another refrigeration expert said that if the bunkers were ¾ full, it was safe in his opinion to leave the car as it was for delivery the next morning. But another witness for defendant testified that he examined the bunkers at 9:15 a. m., September 8, at Sewall's Point, and found the bunkers still ¾ full of ice. We note also that none of defendant's witnesses testified as to the outside temperature at that time. Viewing defendant's own evidence as a whole, with the various estimates, opinions and conclusions it presented, we think it was such that reasonable men might differ as to its effect, as well as to the inferences to be drawn therefrom. When this evidence is examined along with the plaintiff's evidence, which contradicted it in several important particulars, we think there can be no doubt at all that the decision should have been, as it was, left to the jury.

There is no help for appellant in Delphi Frosted Foods Corp. v. Illinois Cent. R. Co., D.C.W.D.Ky., 89 F.Supp. 55, on which it relies. There, in holding for the carrier, the court found that aside from the evidence rebutting the prima facie case of negligence, the defendant introduced considerable testimony to the effect that the damage was the result of the shipper's improper processing, packing and loading, and the inherently perishable nature of the product. In affirming, Delphi Frosted Foods Corp. v. Illinois Cent. R. Co., 6 Cir., 188 F.2d 343, the circuit court held not only that the railroad had shown it complied with the shipper's instructions, but that the evidence sustained the lower court's finding that the fruit was not in sound condition when shipped. Such was not the evidence in this case. Nor is this case governed by Atlantic Coast Line R. Co. v. Georgia

Packing Co., 5 Cir., 164 F.2d 1, 4, to which we have referred above. There the court held that proof by the carrier of compliance with shipper's instructions is a complete defense to an allegation of negligence, and that the carrier "incontrovertibly showed more than full compliance with plaintiff's instructions." The showing of the carrier in this case was very far from being incontrovertible. We would only be repeating ourselves if we attempted again to summarize the evidence from which the jury could have found failure to comply with shipper's instructions.

Defendant also makes the point that it should be absolved of liability if the damage to the shipment resulted from an inherent vice or defect in the perishable property shipped. Such of course is the law. Shapiro v. Pennsylvania R. Co., 65 App. D.C. 324, 83 F.2d 581; Railway Express Agency v. H. Rouw Co., 198 Ark. 423, 128 S.W.2d 989; W. E. Roche Fruit Co. v. Northern Pac. Ry. Co., 184 Wash. 695, 52 P.2d 325. That is just another way of saying that if the meat was unsound or spoiled when delivered to the carrier, the shipper has no claim. But the evidence we have recited above established, or so the jury could have found, that such was not the fact.

We find nothing in any of the cases cited to us which would indicate that on the evidence as here presented the case should have been taken from the jury.

Affirmed.